712 A.2d 673

EMANUEL BALSAMIDES, SR., EMANUEL BALSAMIDES, JR., AND THOMAS BALSAMIDES, PLAINTIFFS–RESPONDENTS/ CROSS–APPELLANTS, v. LEONARD M. PERLE, DEFENDANT– APPELLANT/ CROSS–RESPONDENT, AND PROTAMEEN CHEMICALS, INC., ADAM PERLE, DANIEL PERLE, MANLEN REALTY CORP., AND RELCO CHEMICAL CO., INC., DEFENDANTS/CROSS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 28, 1998—Decided June 17, 1998.

Wecker, J.A.D., concurred and filed opinion.

8 

12

Before Judges DREIER, PAUL G. LEVY and WECKER.

*Martin N. Crevina,* argued the cause for appellant Leonard M. Perle and for defendants/cross-respondents (*Buckalew, Frizzell & Crevina,* attorneys; *Robert J. Buckalew* and *Mr. Crevina,* on the brief).

*Alan S. Pralgever,* argued the cause for respondents/cross-appellants (*Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone,* attorneys; *Daniel L. Schmutter* and *Mr. Pralgever,* on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendant Leonard N. Perle, the owner of one-half of the stock in Protameen Chemicals, Inc., appeals from a judgment in favor of

plaintiff Emanuel Balsamides, Sr., the owner of the other one-half interest, and his sons, directing Perle to sell his stock in this deadlocked corporation for $1,960,500. The judge further awarded Balsamides $75,000 in punitive damages. Balsamides cross-appeals against Perle and his sons, claiming that he was entitled to counsel fees and that the one-year restrictive covenant imposed upon Perle, which has now expired, should have been extended to a term coextensive with that originally contained in the parties' stockholders' agreement. (When used in the singular, the names Perle and Balsamides or terms plaintiff and defendant shall refer to the fathers).

## I.

We will not review in detail the facts of the parties' stormy relationship in the final years they worked together. Suffice it to say that they had built up a successful chemical business by utilizing Perle's technical talents and administrative skills and Balsamides' sales acumen and knowledge of the market. This was a classic case of an inside man and outside man, each doing his job superbly, but each also viewing his job as the more important in the company. Each had two sons who eventually came into the business. Balsamides' sons worked in the field and earned substantial salaries and commissions. Perle's sons started learning the administrative areas, intending eventually to be salesmen, with Perle attempting to see that their remuneration matched that of the Balsamides sons.

The following findings of fact by the trial judge concerning Perle's wrongful conduct find support in this record. Our recounting of the findings shall not be taken as our independent determination of such wrongdoing, but only that we recognize the scope of appellate review, namely, that findings upon which a judgment is based will not be disturbed if they are supported by adequate, substantial and credible evidence in the record. *Rova Farms Resort, Inc. v. Investors Ins. Co. of Am.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).

The court found: Perle's purposeful refusal or delay in providing technical information requested for plaintiffs' customers; Perle's refusal to provide product samples when requested by plaintiffs' customers; Perle's refusal to stock materials in the company's warehouse that he knew plaintiffs' customers would be ordering; Perle's decision to allow his son Adam to sell carbopol in Florida in violation of Protameen's distribution agreement with B.F. Goodrich; Perle's denial of plaintiffs' access to the company's computer system; and Perle's disparaging treatment of plaintiffs in the eyes of Protameen's personnel and his condoning of similar actions by his sons. All these actions were done, according to the court, in an effort to embarrass plaintiff with his customers. Consequently, the court described Perle's conduct as a breach of his fiduciary responsibility as a co-equal shareholder, which constituted shareholder oppression.

In support of these findings, the court noted that the credibility and the demeanor of the witnesses played an important part, and it cited Perle's "demeanor on the witness stand [which] told a story louder and more clearly than any of the words spoken during the course of this trial. His quest for equality for his sons and his resentment completely blinded him to the practical implications of what he was doing."

We are well aware that the record is not one-sided. Even granting deference to the credibility determinations of the trial judge, we have seen significant provocations and even alleged ethnic disparagement on the part of Balsamides, which obviously heightened the estrangement of these erstwhile friends and close business associates. The court, however, after first attempting to preserve the integrity of the corporation by appointing a provisional director, determined that the corporation would have to be sold or have one partner buy out the other. In fact, in November 1995, Robert Pettus, one of the corporation's suppliers, offered to purchase the corporation's assets for $7.5 million dollars. He was, however, unable to secure Balsamides' agreement to the purchase. After considering the alternatives, the trial judge concluded:

It is my judgment that Leonard Perle should be required to sell his interests in Protameen to Emanuel Balsamides. That is the remedy that I consider to be the fair, just, and equitable remedy in these circumstances. The buy-out of one co-owner by the other seems to me to present the greatest possibilities of resolving this matter in the near future, of maximizing the benefit to both parties, and in preserving Protameen and its business to the greatest extent possible....

. . . .

I find from the evidence that Mr. Balsamides was crucial to the growth over the years. He brought the major accounts and customers into the fold as a result of his contacts in the cosmetic business and his ability as a salesman.... [A]s the business grew, [Perle] ... spent all his time as the inside man, doing the technical work, the administration, and running the office.... I do not intend to demean the contributions of Leonard Perle to Protameen's success. However, the primary reason for its amazing growth lies in the skill with which Emanuel Balsamides handled the sales side of Protameen.

I find as a fact further that Mr. Balsamides is the outward presence of Protameen in the cosmetic industry. When people in the cosmetic field think of Protameen, they think of Mr. Balsamides....

And finally, the decision to permit Mr. Balsamides to buy the interest of Mr. Perle is supported by the conduct of Mr. Perle I outlined earlier.... I should say at the same time that I do not believe the Balsamides group is entirely blameless in this entire controversy. I have heard testimony of alleged wrongful acts on their part. However, none of that testimony had convinced me that there was any wrongdoing on the part of the Balsamides group, that is wrongdoing that was intentional in nature and injurious to the business of the corporation. On the other hand, Mr Perle conducted himself in his vendetta against the Balsamides in a way that was harmful to the business of Protameen, and he displayed little or no regard for the welfare of his own company and the interests of his partner.

■ There is no question that this decision was consistent with *N.J.S.A.* 14A:12–7(1)(c). *See Bonavita v. Corbo*, 300 *N.J.Super.* 179, 187–88, 692 *A.*2d 119 (Ch.Div.1996). It is also clear that stockholders in a close corporation owe each other substantially the same fiduciary duty of good faith and loyalty as that owed by partners in a partnership. *Muellenberg v. Bikon Corp.*, 143 *N.J.* 168, 177, 669 *A.*2d 1382 (1996).

■ These principles and the buy-out order of the trial judge are not seriously contested by Perle. His challenge to the court's findings relate more to the punitive damage award against him and to some of the considerations of the court in establishing the fair market value of Perle's interest in the corporation. Had the transfer itself been challenged, we have no question that, notwith-

standing the lack of express authority in *N.J.S.A.* 14A:12–7 to order a sale in a situation such as the one before us, the trial court as a court of equity has the power to order such a purchase under exceptional circumstances, such as here, where the only alternative to a buy-out is dissolution. *See Brenner v. Berkowitz,* 134 *N.J.* 488, 513, 634 *A.*2d 1019 (1993). Parenthetically, we note that the principals of the corporation might in some respects be considered minority shareholders, even though they each own fifty percent of the stock. *See Bonavita v. Corbo, supra,* 300 *N.J.Super.* at 187–89, 692 *A.*2d 119.

■ Perle has argued that three of the various findings we noted earlier did not constitute breaches of fiduciary duty, namely, the alleged abusive treatment of Balsamides and his family, the sale of carbopol in Florida, and permitting shortages in inventory. The mistreatment of a co-stockholder who is also an officer and director of the company, even if allegedly done to protect the interest of Perle's sons, could well be found a violation of the fiduciary standards of honesty and good faith imposed upon Perle, which should have prevented him from placing private interests in conflict with those of the corporation. *See Fender v. Prescott,* 101 *A.D.*2d 418, 476 *N.Y.S.*2d 128, 132 (1984), *aff'd,* 64 *N.Y.*2d 1077, 489 *N.Y.S.*2d 880, 479 *N.E.*2d 225 (1985). Even if these three breaches were eliminated, however, the other three determined by the court provide an ample basis to uphold the buy-out determination.

## II.

The principal issue in this case is one of valuation. Each party obtained the services of a valuation expert. Balsamides produced Thomas Hoberman, a C.P.A., and Perle produced Robert Ott, a Chartered Financial Analyst. Hoberman appraised the corporation's inventory, relying upon the company's price lists. However, he could not certify the audit because he did not compare the actual vendor invoices with Protameen's own price lists. His inventory valuation of $1,991,943 also was based upon financial statements prepared by the company's accountants for 1990

through 1994 and the first half of 1995, and its tax returns from 1990 through 1994. Although he attempted to interview Perle and his sons, he was denied such an interview. Perle, however, explains this denial resulted from his being suddenly confronted with a request for the interview by Balsamides' C.P.A. and attorney. In that situation he wished to have his own attorney present, but plaintiff would not accommodate the delay.

In any event, Hoberman valued the corporation at $4,176,000, including its main assets: its accounts receivable and inventory. He used negative factors in his valuation, namely, the company's loss of a chemist, Perle, who could provide technical support to the employees and customers, the corporation's reliance on mineral and animal based chemicals which were being phased out by the industry, and the company's purchasing policies which placed a priority on price and not on quality. He also stated that there was a market concentration risk for the company because thirty percent of its sales were represented by its six largest customers.

In computing the fair market value, Hoberman recognized the market, income, and cost approaches, but was forced to reject the market approach because no comparables could be found of a size approximating that of Protameen. He also could not use the income approach because he could not speak with Perle to determine future operating expenses and capital expenditures which were needed to compute a credible anticipated cash flow. He therefore used an excess earnings approach authorized for tax purposes by the Internal Revenue Service in Revenue Ruling 68–609, 1968–2, C.B. 327. He explained that he calculated a percentage return on the average annual value of the tangible assets used in the business, using, at a minimum, the immediate five years prior to the valuation date. That amount was deducted from the average earnings of the business for the time period, and the resulting amount, considered the average annual earnings from the intangible assets of the business, was then capitalized at a certain percentage. As is noted later, this capitalization rate was challenged by Ott.

Hoberman determined the normalized income and the net tangible assets by using the previous six years' data, weighing the immediate past year with a factor of six; the year before that with a factor of five, and so on. Thus, the more recent years were more heavily weighted. He determined the normalized income for the period to be $1,195,659 and the net tangible assets to be $2,786,949. He used eleven percent as the rate of return on net tangible assets ($306,000), and subtracted this amount from the normalized annual income. He then capitalized this modified income figure, using a thirty percent capitalization rate which, when added to the net tangible asset amount, equaled $6,425,000. He then subtracted a marketability discount of thirty-five percent to arrive at a final valuation figure of $4,176,000. This figure, according to Hoberman, also anticipated the restrictive covenant imposed upon the Perles by the trial judge. He further testified that he did a rough valuation of two similar companies.

Ott disagreed with Hoberman's valuation in several respects. He contested the use of the excess earnings approach which, according to Ott, is the least desirable method of valuation, because it produces a wide range in values and is generally used for relatively small close corporations with relatively stable or flat earnings. In the Protameen case, there had been significant growth over the five previous years. Next, Ott objected to the use of the six-year time period, because the earlier years were before Protameen exhibited significant growth and were not fairly reflective of future earnings. He therefore used a three-year unweighted average. He also testified that Hoberman had mistakenly capitalized earnings before taxes rather than after taxes and had normalized Perle's salary but not that of Balsamides.

Further, Ott objected to the eleven percent rate used by Hoberman to determine the return on net tangible assets and to the thirty percent capitalization rate because of the company's significant positive growth. Ott used rates of nine and eighteen percent respectively. His strongest disagreement, however, was with the application of the thirty-five percent marketability dis-

count which Ott stated was not appropriate when valuing 100% of a company. He testified that at most a nominal discount should be used in such an instance, perhaps a seven percent marketability discount to reflect a brokerage fee inherent in such sales. Ott's valuation of the company therefore was $8,285,000, utilizing both the market and income approach, but with greatest reliance on the income approach. He corroborated this figure using four publicly traded companies in the same category as Protameen.

We cannot say that we are in complete agreement with the trial judge's acceptance of Hoberman's valuation. We note, however, that the acceptance or rejection of an expert opinion concerning the valuation of corporate stock is a matter peculiarly within the province of the trier of fact and its determination will be accorded great deference. *Bricklin v. Stengol Corp.*, 1 *Conn. App.* 656, 476 *A.*2d 584, 589, *certif. denied*, 194 *Conn.* 803, 482 *A.*2d 709 (1984). See also *Fechtor v. Fechtor*, 26 *Mass.App.Ct.* 859, 534 *N.E.*2d 1, 4, *rev. denied*, 404 *Mass.* 1103, 537 *N.E.*2d 157 (1989), and 12b William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 5906.120 (rev.vol.1993), where the editor states "the trier of fact has considerable freedom ... to select the method or methods of valuation appropriate in the particular case." (Footnote omitted). We also subscribe to the general principle that a trial court's determination of value will be reviewed under an abuse of discretion standard. *County of Ocean v. Landolfo*, 132 *N.J.Super.* 523, 528, 334 *A.*2d 360 (App.Div.1975); *East Orange v. Crawford*, 78 *N.J.Super.* 239, 243, 188 *A.*2d 219 (Law Div.1963).

There were, however, certain errors that were clear and did not fall within the discretion standard. The use of the excess income approach was noted by the judge not to be a preferred method of valuation. He nevertheless found it appropriate in this instance. We will discuss this later in more detail. The use of the eleven percent return rate on net tangible assets was also subject to question, especially since Revenue Ruling 68–609 recommends a rate of between eight and ten percent. Hoberman explained this

difference because as a small company Protameen could not get a prime rate, but Ott testified that Protameen could get a prime rate or even less because of the nature of its tangible assets, namely, large working capital-type items. Defendants also challenge the thirty percent capitalization rate, one of the more difficult problems in valuation. *See* Rev. Rul. 59–60, 1959–1 C.B. 237. Ott had suggested an eighteen percent capitalization rate, but Hoberman had noted six negative factors associated with the company which caused Hoberman to raise the rate he would have used by an additional nine percent. Lastly, the court accepted Hoberman's thirty-five percent marketability discount, eschewed entirely by Ott, except for a possible brokerage factor. We will discuss these problems in more detail *infra.*

### A.

There is no question that the valuation of a close corporation under *N.J.S.A.* 14A:12–7(8)(a) is extremely difficult. The statute states:

> The purchase price of any shares so sold shall be their fair value as of the date of the commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12–7(1)(c).

Valuation of stock in a close corporation cannot realistically be limited to its book value, but must deal with the realities of good will, actual profit, and, if necessary, the discounting of the value of a minority interest. *Lavene v. Lavene,* 148 *N.J.Super.* 267, 275, 372 *A.*2d 629 (App.Div.), *certif. denied,* 75 *N.J.* 28, 379 *A.*2d 259 (1977). Most courts have used Revenue Ruling 59–60 as a guide to value a close corporation. *See Bowen v. Bowen,* 96 *N.J.* 36, 44, 473 *A.*2d 73 (1984). The factors to be considered under this Revenue Ruling are: the nature of the business and the history of the enterprise from its inception; the economic outlook in general and the condition and outlook of the specific industry in particular; the book value of the stock and the financial condition of the business; the earning capacity of the company; the dividend-paying capacity of the company; whether or not the enterprise

had goodwill or other intangible value; sales of stock and the size of the block of stock to be valued; and the market price of stocks of corporations engaged in the same or a similar line of business having their stocks traded in a free and open market. Rev. Rul. 59–60 at § 4.01. As the trial judge noted on the remand in *Lavene, supra,* this list is not an all inclusive one, and there is no precise formula for determining the value of the close corporation stock. The factors should not be considered in a vacuum and "consideration must be given to the relationship of *all* relevant factors on the basis of informed judgment and common sense." *Lavene v. Lavene, supra,* 162 *N.J.Super.* at 187, 194, 392 *A.*2d 621 (emphasis added).

As we noted, Hoberman used Revenue Ruling 68–609 to value this stock. This ruling, however, opens with a sentence that the approach should only be used if there is no better basis available to determine the value. Hoberman determined to use the basis because of the unavailability of data allegedly withheld from him by Perle, but which Perle contended he declined to provide only because of the circumstances of the demand and his desire to have his attorney present.

The excess earnings method, as promulgated in Revenue Ruling 68–609, involves five steps in arriving at a conclusion of value: determination of the fair market value of the business's net tangible assets; determination of a reasonable percentage return on the average value of net tangible assets used in the business over at least the last five years; subtraction of the reasonable return on net tangible assets from the average earnings over that period in a manner that fairly reflects the probable future earnings of the business; capitalization of the intangible assets of the business at an appropriate rate, namely, the difference between the average earnings and the amount that represents a reasonable return on tangible assets; and addition of the net tangible assets to the intangible assets to arrive at a value for the business. The Ruling goes on to state:

The percentage of return on the average annual value of the tangible assets used should be the percentage prevailing in the industry involved at the date of valuation, or (when the industry percentage is not available) a percentage of 8 to 10 percent may be used.

The 8 percent rate of return and the 15 percent rate of capitalization are applied to tangibles and intangibles, respectively, of businesses with a small risk factor and stable and regular earnings; the 10 percent rate of return and 20 percent rate of capitalization are applied to businesses in which the hazards of business are relatively high.

The above rates are used as examples and are not appropriate in all cases. In applying the "formula" approach, the average earnings period and the capitalization rates are dependent upon the facts pertinent thereto in each case.
. . . .

The "formula" approach should not be used if there is better evidence available from which the value of intangibles can be determined. . . .

Accordingly, the "formula" approach may be used for determining the fair market value of intangible assets of a business only if there is no better basis therefor available.

Even the IRS cautioned its own employees with respect to this method stating that the rates of return were arbitrary and unsupported by other data. This criticism has been recognized by the courts. *Smith v. Smith,* 111 *N.C.App.* 460, 433 *S.E.*2d 196, 214 (1993), *rev'd on other grounds,* 336 *N.C.* 575, 444 *S.E.*2d 420 (1994); *Sharon v. Sharon,* 178 *Wis.*2d 481, 504 *N.W.*2d 415, 419 (App.), *rev. denied,* 510 *N.W.*2d 137 (Wis.1993). We question therefore why the court when presented with the excess earnings method under Revenue Ruling 68–609, with its recommended rate of return and capitalization rate increased even beyond the ruling's recommendations, and also presented with the favored income method of valuation by Ott, chose to rely on Hoberman's methodology. The court's explanation that the three years used by Ott rather than the six years used by Hoberman made Ott's approach less sound does not explain why the court would not then have directed a valuation by the income method using the weighted six-year approach. A court is not limited to choosing between two methods on an either/or basis. There is no reason why the court could not have selected the best of each, even if it involved a short adjournment so that the experts could compute the data based upon the court's resolution of their differences.

## B.

With regard to the eleven percent rate of return, we realize that the eight percent to ten percent recommendation of Revenue Ruling 68–609 is not mandatory. *See Wright v. Wright*, 904 *P*.2d 403, 407 (Alaska 1995) (upholding a twelve percent rate of return on net tangible assets). Although Ott's explanation again appears more reasonable considering the nature of Protameen, we must give deference to the trial judge's determination that the eleven percent rate gave proper recognition to the corporation's inability to obtain money at less than prime plus two percent. If on review, the court reconsiders this, perhaps by viewing the rate at which the corporation actually borrowed money, the judge may revise this determination.

## C.

Similarly, regarding the capitalization rate, we question the court's acceptance of a rate as high as thirty percent as opposed to Ott's eighteen percent. Hoberman based his capitalization rate on six negative factors, all accepted by the trial court. While we question the court's acceptance of all these factors for the reasons we will state, we understand that such acceptance is within the trial judge's discretion, given the evidence that was placed before him. The judge, however, failed to explain why the court did not require further explanation of the factors included by Hoberman. If on remand these factors are still found applicable, we can take no issue with the conclusion stated in the court's opinion.

The nine percent adjustment noted earlier came from the six negative factors. We will note our concerns with the listed factors. The first factor was the lack of a full-time chemist, but we do not understand why this could not be readily remedied now that Balsamides has full control of the corporation. The second factor was Hoberman's opinion that the market for the company's animal and mineral based chemicals would decline over a five to ten year period. Implicit in this assumption is that the company

during this time would not expand its product line to make up for any declining market. We do not understand why Hoberman and the court would assume the company would not be innovative. Next was the claim that Protameen's purchasing policies had placed a priority on price over quality. Again, with Balsamides in full control, he could readily remedy this deficiency, if in fact it was a deficiency.

Hoberman also asserted that Protameen's contract with B.F. Goodrich could be canceled at any time, and that six customers accounted for twenty-seven percent of the sales. Again, this presupposes that for any lost customer, Protameen would not find a new customer. This negative factor could as easily have been expressed as a positive factor. With Balsamides in control and focusing on sales without the alleged impediments of an uncooperative "inside man," customers might well be attracted so that sales would actually increase. As to the B.F. Goodrich contract, Hoberman admitted that he had not read the contract, but that it would not have influenced his testimony, even if there was no real risk that B.F. Goodrich would not cancel. We do not understand why Hoberman or the court would assume that Perle's replacements chosen by Balsamides would be unacceptable to B.F. Goodrich.

The sixth factor was a conclusion that Balsamides had generated nearly half of Protameen's sales. Hoberman obtained this information from Protameen's books and from Balsamides. This has been true for some time, and if the import of this is that Balsamides' death or disability would result in a loss of sales, the corporation could well protect itself through the use of suitable insurance. In short, for these combined alleged risks to warrant a nine percent shift in the capitalization rate, they at least should be reexplored by the trial judge on remand. Again, we state that the judge was not limited to either accepting Hoberman's analysis totally or rejecting it. If some or all of these factors still should be accepted, the trial judge may do so, or may consider other factors.

The largest factor in this instance might well be the potential competition, which we were informed at oral argument has actually come to pass, by Perle's sons. Perle's own three-year non-competition agreement was shortened by the judge to one year, and Perle's potential future competition was another possible valuation factor. Of course, the court cannot use hindsight from this vantage point to determine the proper value as of the date of the original trial. But even at that time, the potential for this competition existed and was argued, because no restrictive covenant bound the sons following their employment by the corporation, and Perle could compete after one year. This factor may well be sufficient to warrant the eleven percent addition to the capitalization rate. What we have indicated is that the trial judge in a valuation case such as this must review and analyze all components of the experts' opinions, and even probe the experts with respect to other relevant factors. When this process is accomplished, the court's conclusions are entitled to great weight. But, where the court accepts an expert's report merely because a particular element is more credible than the equivalent in the adversary's report, without analyzing each component, we must apply a strict analysis to the judge's conclusions.[1]

Perle also challenges the failure of Hoberman and the trial judge to have normalized Balsamides' salary in the same manner as Perle's salary. Here, as in other close corporations, an accountant must distinguish between what part of compensation is truly salary and what part is actually a distribution of profits. *Donahue v. Draper*, 22 *Mass.App.Ct.* 30, 491 *N.E.*2d 260, 264, *rev. denied*, 397 *Mass.* 1104, 494 *N.E.*2d 388 (1986). Hoberman properly determined that to obtain services to replace Perle, the corporation would pay far less than the $350,000 Perle received as annual compensation. Hoberman determined that Balsamides' $350,000 compensation was equivalent to his worth as a salesman,

---

[1] There may, of course, be situations where an expert's premise is so outlandish that other premises and conclusions in the report may be rejected out-of-hand. That was not the case here.

based on the sales he brought in, and that another salesman performing the same function would have received this full compensation. The trial judge was well within his discretion in accepting this explanation.

Perle also had challenged Hoberman's reduction of the value of the Protameen inventory by $412,000 to reflect his physical inventory in September 1995. Perle contends that this physical inventory had not been shown to be the same as the inventory on the valuation date of June 30, 1995. This, however, was a disputed fact that was resolved by the trial judge based on the evidence before him. Even though defendants contended that Hoberman had not taken an inventory of four warehouses, we fail to find a basis for this in the record, and in any event the trial judge was within his discretion when he resolved this issue based upon his view of the testimony.

In all, the judge's acceptance of Hoberman's excess earnings approach and the substantial adjustments in Balsamides' favor made at the suggestion of his expert, may or may not survive a reexamination of the specific areas we have noted earlier. We have merely pointed out internal inconsistencies or unanswered questions that should be examined by the trial judge as well as the additional competitive factor of Perle's sons not being subject to any restrictive covenant.

### D.

The issue of the thirty-five percent marketability discount applied by the court requires a separate analysis. There is no question that if a minority interest in a closely held corporation is sold to an outsider there is usually a marketability discount that must be applied to determine the fair market value of the shares. *See* James Edward Harris, *Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts, 42 Ark.*

*L.Rev.* 649, 657 (1989); Steven E. Bolten, *Discounts for the Stocks of Closely Held Corporations,* 123 *Tr. & Ests.* 22 (1984).[2]

The marketability discount reflects the fact that there is but a small pool of potential buyers and that the disposal of such an interest is difficult. This discount is different from, but similar to the minority discount, applicable only to the sale or valuation of a minority interest in a corporation. *See Robblee v. Robblee,* 68 *Wash.App.* 69, 841 *P.*2d 1289, 1294 (1992). Marketability discounts have ranged between thirty and forty percent. See *Columbia Management Co. v. Wyss,* 94 *Or.App.* 195, 765 *P.*2d 207, 213 (1988) (33.3%), and Bolten, *supra,* suggesting an average discount of 39.86%, and Harris, *supra,* stating that "the authorities reviewed ... indicate that the illiquidity discount for closely held corporations should at the very least, be 35%" and further noting that "appraisal experts in many cases will determine that the discount ... should be between 40% and 45%, and in some cases even more." 42 *Ark. L. Rev.* at 659.

The problem with applying such a discount in this case is that there was no sale of Perle's stock to the general public nor was Balsamides buying an interest in the company, minority or otherwise, that might result in the later sale of a partial interest to a member of the public. Rather, this was a case of a fifty percent owner buying the stock of the other fifty percent owner, resulting in the buyer obtaining total ownership of the corporation. The appraisal by Hoberman, accepted by the court, with all of its deductions for adverse internal and market conditions, was aimed at determining the fair market value of the entire corporation if that corporation were to be sold. Applying a marketability dis-

---

2 *See also* Edwin T. Hood, *et al., Valuation of Closely Held Business Interests,* 65 *UMKC Law Rev.* 399, 437–41 (1997) (stating that under some circumstances, a marketability discount should be applied even when controlling shares are transferred). But this principle is inapplicable to a transfer where the transferee will own all of the stock.

count to reduce that valuation flies in the face of the initial valuations of both Hoberman and Ott of 100% of the corporation.

This principle was recognized in *Brown v. Allied Corrugated Box Co., Inc.*, 91 *Cal.App.*3d 477, 154 *Cal.Rptr.* 170, 175–76 (1979), where, in a related situation, a minority shareholder's stock was purchased by the majority shareholder to prevent an involuntary dissolution. The trial judge had accepted the imposition of the minority discount devaluing the shares. On appeal, the court rejected such a discount, reasoning as follows:

> [T]he rule justifying the devaluation of minority shares in closely-held corporations for their lack of control has little validity when the shares are to be purchased by someone who is already in control of the corporation. In such a situation, it can hardly be said that the shares are worth less to the purchaser because they are noncontrolling.

But cf. *Blake v. Blake Agency, Inc.*, 107 *A.D.*2d 139, 486 *N.Y.S.*2d 341, 344, *appeal denied*, 65 *N.Y.*2d 609, 494 *N.Y.S.*2d 1028, 484 *N.E.*2d 671 (1985), (where in a non-buy-out case the court found a marketability but not a minority discount to be appropriate under the facts of the case). *See also Charland v. Country View Golf Club, Inc.*, 588 *A.*2d 609, 612–13 (R.I.1991) (finding the lack of marketability discount "inapposite when a corporation elects to buy out a shareholder who has filed for dissolution of the corporation"); *Morrow v. Martschink*, 922 *F.Supp.* 1093, 1105 (D.S.C.1995), (rejecting such a discount); *Hendley v. Lee*, 676 *F.Supp.* 1317, 1330 (D.S.C.1987) (same).

Not all jurisdictions agree that there should be no marketability discount in connection with a transfer of controlling interests. *See Rigel Corp., supra*, 245 *Neb.* 118, 511 *N.W.*2d 519, 526 (1994) (citing instances where marketability discounts have been applied for transfers to controlling stockholders); *Charland, supra*, 588 *A.*2d at 612–13 (noting that courts deciding the issue are split).

We determine, however, that *N.J.S.A.* 14A:12–7(8)(a) does not warrant a departure from the sensible approach that would decline to apply a discount for lack of marketability when one owner transfers his or her interests to another owner, who in turn

becomes the corporation's sole shareholder.[3] Our statute directs
that the price of the shares "shall be their fair value as of the date
of commencement of the action or such earlier or later date
deemed equitable by the court, plus or minus any adjustments
deemed equitable by the court if the action was brought in whole
or in part under paragraph 14A:12–7(1)(c)." It is neither "fair"
nor "equitable" for the surviving shareholder to obtain the selling
shareholder's interest at a discount. If there has been a fair
appraisal of the fair market value of the entire corporation which
will be owned in full by the surviving shareholder, it serves neither
fairness nor equity to require a fifty percent shareholder to
receive less than half of this total figure. The marketability of the
total corporation is incorporated into the original determination of
fair market value, and there is no reason to apply any minority
discount. We therefore vacate the thirty-five percent discount
and the trial judge should make the appropriate adjustment on
remand. The court may, however, consider a brokerage discount,
apparently acceded to by defendant's expert.

### III.

Perle also challenges the court's award of punitive damages,
contending that the record failed to support the finding that Perle
"acted out of a conscious, wilful, malicious desire to injure either
Balsamides or Protameen." He asserts that at best this was a
breach of contract case in which punitive damages are not usually
awarded. In addition, he claims that there was no showing that
either Balsamides or Protameen suffered any harm as a result of
his actions. Lastly, he claims that there was insufficient evidence
of his net worth to assess his ability to pay such damages.

---

[3] We do not disagree in concept with Judge Wecker over the issues that she
would consider in evaluating a marketability discount. However, in a case
where the fair market value of the entire corporation has already been valued,
these factors have already been included in this assessment. The marketability
of less than all of the shares, when sold to as purchaser who will then own the
entire corporation, is not a separately-assessable factor, absent unusual circum-
stances not present here.

██ We will initially dispose of the last point. The judge clearly had before him the fact that, even under the reduced valuation of the company, Perle was to receive nearly $2,000,000. His ability to pay a $75,000 punitive damage award was not really in issue.

In awarding the punitive damages the judge stated:

> My review and consideration of the evidence I heard at trial convinces me that Mr. Perle[ ] .... maliciously conducted himself in a manner intended to do harm to his partner and his partner's sons. He not only wantonly and willfully disregarded the rights of his partner but, also, the rights of his partner's sons and his own corporation.
>
> . . . .
>
> Mr. Perle delayed or refused to provide technical information sought by customers of the Balsamides group. Also ... he refused to take any action to see to it that samples requested by Balsamides customers were promptly prepared and dispatched. [This] was done for the specific purpose of damaging the Balsamides' reputation in the cosmetics industry. It was designed to embarrass the Balsamides group with their customers.
>
> With the same purpose in mind, Mr. Perle intentionally failed to stock in the warehouse materials that he knew from experience would surely be ordered by Balsamides' customers over the next month or two.... '
>
> Further, to prevent the Balsamides family from providing timely and efficient service to their customers, Mr. Perle purposely took action to deny them access to the computer records at Protameen....
>
> Finally, the evidence at trial convinced me that Mr. Perle embarked on a course of conduct—and condoned the same course of conduct on the part of his sons—to disparage, demean, humiliate and embarrass Mr. Balsamides and his sons among Protameen employees....
>
> Common sense and rather obvious inferences drawn from the evidence I heard at trial compel my conclusion that the above described conduct of Mr. Perle did harm to Mr. Balsamides, to his sons and to Protameen Chemicals. There can be no doubt that his conduct caused a lessening in the service Mr. Balsamides and his sons were able to offer their customers over an extended period of time.... [T]here can be no doubt but what significant damage to Mr. Balsamides' reputation and to the reputation of Protameen was achieved by Mr. Perle.

██ The decision to award punitive damages and the amount of such damages is within the sound discretion of the factfinder. *Leimgruber v. Claridge Assocs. Ltd.*, 73 *N.J.* 450, 456, 375 *A.*2d 652 (1977). "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an 'evil-

minded act' or an act accompanied by a wanton and wilful disregard of the rights of another." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 *N.J.* 37, 49, 477 *A.*2d 1224 (1984).

Perle claims that punitive damages should not have been awarded because this is a breach of contract action, namely a breach of the shareholders' agreement. While punitive damages are usually not awarded in litigation involving breach of a commercial contract, they may be awarded where there is a breach of trust between the parties beyond the contractual breach. *Sandler v. Lawn–A–Mat Chem. & Equip. Corp.,* 141 *N.J.Super.* 437, 449, 358 *A.*2d 805 (App.Div.), *certif. denied,* 71 *N.J.* 503, 366 *A.*2d 658 (1976). And the right to award such damages in the context of actions brought pursuant to *N.J.S.A.* 14A:12–7 has been clearly established. *See Musto v. Vidas,* 281 *N.J.Super.* 548, 564, 658 *A.*2d 1305 (App.Div.1995), *certif. denied,* 143 *N.J.* 328, 670 *A.*2d 1069 (1996); *Maul v. Kirkman,* 270 *N.J.Super.* 596, 619–20, 637 *A.*2d 928 (App.Div.1994). We therefore find no merit to this argument.

Perle's challenge to the factual basis for the judge's conclusion must fail even though the conduct was not as serious as that in *Maul. See* 270 *N.J.Super.* at 608–16, 637 *A.*2d 928. The trial judge here found the conduct to be sufficiently egregious to satisfy the acknowledged standard for the award of such damages. Perle's actions, particularly his refusal to provide technical information and fill sampling requests, not only exhibited self-interest, but placed the interests of the corporation in jeopardy by creating a hostile work environment and leading various customers to question Protameen's reliability. While this is a close question, the trial judge's determination of credibility and the underlying facts cause us to sustain the punitive damages, irrespective of whether on these facts we may have ourselves awarded them. By the same token, plaintiff's claim on the cross-appeal that these damages should be assessed at a higher level must be rejected for the same reason. This award was discretionary by the trial judge and will be sustained.

### IV.

Balsamides cross-appeals from the failure to award counsel fees under *N.J.S.A.* 14A:12–7(10), based upon Perle's bad faith. We note that Perle did not respond to this argument and the trial judge did not rule on Balsamides' request.

*N.J.S.A.* 14A:12–7(10) provides:

> If the court determines that any party to an action brought under this section has acted arbitrarily, vexatiously, or otherwise not in good faith, it may in its discretion award reasonable expenses, including counsel fees incurred in connection with the action, to the injured party or parties.

Inasmuch as the trial judge made no determination of this issue, we direct that on remand the matter of counsel fees be considered. *See Nohe v. Roblyn Dev. Corp.*, 296 *N.J.Super.* 172, 178–79, 686 *A.*2d 382 (App.Div.), *certif. denied*, 149 *N.J.* 36, 692 *A.*2d 50 (1997). We further note that Balsamides has failed to comply with *R.* 4:42–9(b) by not providing a detailed affidavit or certification of services. This also should be remedied on remand.

### V.

Lastly, Balsamides argues that the restrictive covenant imposed on Perle was of too short a duration and that the covenant should have been extended to include Perle's sons. The court imposed a one-year restriction which has long since expired. The judge rejected the imposition of a restriction on the sons, who were not parties to any shareholders' agreement nor otherwise contractually precluded from competition. Balsamides' claim that Perle had already violated the non-competition restriction was rejected by the court after viewing the proofs concerning the alleged violation. We need not further review this aspect of the matter. Notwithstanding the fact that the parties' original agreement imposed a three-year restrictive covenant, it would serve no good purpose over a year following the termination of the court's restrictions to change the status quo. We recognize the ongoing business relationships of Perle's sons, and the fact that the parties have ordered their lives on the basis of the court-imposed restric-

tion. What might have been is not the issue here. The trial judge carefully considered the effect of imposing a restriction upon Perle's sons in defining the scope and duration of the restriction placed on Perle himself. We see no reason to change this determination.

As we noted earlier, however, the lack of the restriction on Perle's sons, and the short duration of Perle's own restriction, might be factors in the valuation of the business. Balsamides suggested that a $750,000 reduction in the overall valuation might be warranted. At this stage in the proceedings, we cannot and should not place any value on this factor, but we leave it to the trial judge on remand. As we noted earlier, the value, if any, is not to be assessed utilizing the hindsight gained in the period since the original order. The loss of customers, if it has occurred as alleged at oral argument before us, may be due to the lack of restrictive covenants, or to the inability of Balsamides to run the company himself. This competition may already have been factored into the judge's valuation when he noted that customers might be lost. The normal accretion of business might also be a factor in the base calculations of worth, since every business gains and loses customers, especially when employees leave and set up competing firms.

These and many other factors might be considered by the trial judge in determining whether the nine-percent reduction discussed in detail earlier was truly warranted or need be adjusted. Suffice it to say, we will not be so heavy handed as to impose at this late date non-competition restrictions upon the parties to affect decisions already made by them, their suppliers and their customers in the marketplace.

This matter is remanded to the Chancery Division for reconsideration of the valuation of Perle's interest in Protameen in accordance with this opinion and for consideration of the issue of an award of counsel fees to plaintiffs. In all other respects the judgment is affirmed.

WECKER, J.A.D., concurring.

I concur in the majority's decision affirming the buyout order and punitive damages, and remanding for reconsideration of the valuation of the business and the purchase price of defendant's share. I agree that the value of the business, and thus the value of Perle's fifty percent interest, has been substantially understated. I write separately for two reasons. First, it is my view that the undervaluation has its source in but one mistaken exercise of discretion. That is the trial judge's adoption of the thirty-five percent marketability discount espoused by plaintiff's expert, Hoberman. Second, I would not be understood to reject the application of a marketability discount to all cases of sole ownership of a close corporation, and I fear the majority's opinion could be so read.

With respect to the scope of the remand, I start from the premise noted in *Lavene v. Lavene*, 148 *N.J.Super.* 267, 275, 372 *A.*2d 629 (App.Div.), *certif. denied*, 75 *N.J.* 28, 379 *A.*2d 259 (1977), and recognized by the majority, that valuation of a close corporation is not an exact science.

> The Regulations applicable when valuing closely held business interests are broad guidelines that assist an appraiser in forming an opinion of the value of the business interest. Opinions as to value frequently are far apart especially when such opinions are requested by adversaries. In the final analysis, the outcome of each case is usually a compromise, with the court often finding a value somewhere between the valuation sought by the taxpayer and the higher appraisal sought by the Service. Since the facts of each case will determine the outcome, it is worth noting that case law is usually available to support any position regarding valuation of an interest in a closely held business.
>
> [*Edwin T. Hood, et al., Valuation of Closely Held Business Interests*, 65 *UMKC Law Rev.* 399, 437–41 (1997) (footnotes omitted).]

For that reason, our deference to the trial judge's findings is particularly appropriate. Except for the marketability discount, virtually all of the challenged factors that entered into Hoberman's valuation were subjects of credible though disputed evidence. Given the limited scope of our review, which the court notes, I would not disturb the trial judge's findings with respect to the excess earnings approach of Rev. Rul. 68–609, 1968–2, C.B. 327;

or the use of an 11% fair rate of return on tangible assets; or a 30% capitalization rate to reduce projected excess earnings to present value. These were adequately explained by Hoberman, and the trial judge was entitled to accept them. I would limit the remand to reconsideration of the excessive marketability discount.

With respect to application of a marketability discount in valuing a closely held business, most of the case law and legal literature relates to valuations undertaken for purposes of assessing tax upon a transfer of shares. *E.g.,* James Edward Harris, *Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts,* 42 *Ark. L.* Rev. 649 (1989); Edwin T. Hood, *et al., Valuation of Closely Held Business Interests,* 65 *UMKC Law Rev.* 399 (1997). Little has been written about the value of a close corporation in the circumstances of a court-ordered sale, particularly where a sale between the two fifty-percent shareholders will place 100% ownership in one of the two. The price to be paid should be one that either shareholder (assuming equal interest in 100% ownership) would consider fair, either as the buyer or the seller.

While I agree with the majority that the 35% marketability discount (literally a lack-of-marketability discount) was unjustified on these facts, marketability remains an appropriate factor when valuing a close corporation, including one whose shares are or will be wholly owned by one party.[1] A lack-of-marketability discount recognizes the absence of a ready public market for the shares in a closely held corporation.

> The discount for lack of marketability is based upon the logical premise that investors will not pay as much for stock or partnership interests which have fewer potential purchasers and are therefore less marketable than similar publicly traded interests.

---

[1] In our state courts, such valuation of a closely held business often arises in the context of equitable distribution.

[James Edward Harris, *Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts,* 42 *Ark. L.Rev.* 649, 650 (1989).]

The marketability discount factor is distinct from a minority discount. The latter applies where the block being sold lacks control over significant corporate decisions, and not where one 50% shareholder is to buy out the other at a price to be determined by the court. Theoretically, marketability and minority discounts can overlap, because lack of liquidity is exacerbated when the sale of privately held shares cannot convey control.[2]

However, even a sale that will place 100% ownership in the buyer warrants consideration whether that buyer, should he wish to divest himself of the company in the future, will find a market at a price that fairly reflects what he is paying for half the company. If the proceeds on a sale of the privately-held business are likely to be reduced by a limited market, or by the cost of finding a market (e.g., a broker's commission), it may be fair to reduce the valuation of the business on that account.

If, as my colleagues suggest, the trial court is satisfied that the base valuation of the business has already taken into account a lack of liquidity, then it would be redundant to discount for lack of marketability by more than the transfer costs (including broker's commission). I would simply caution against ignoring fair consideration of a marketability discount in valuing a closely held business.[3] I therefore would not direct the trial court on remand to limit the marketability discount to a fair brokerage fee, although that result may turn out to be appropriate.

---

[2] Of course, if either 50% shareholder here were to seek an outside buyer for his shares, both the minority and marketability factors would undoubtedly affect the price.

[3] For example, defendant's expert, Ott, factored into his valuation a comparison to publicly traded shares of a similar business. That suggests that he did not account for illiquidity, and his valuation then should have been subject to some marketability discount.