716 A.2d 550 (1998)
315 N.J. Super. 32
LAWSON MARDON WHEATON INC., formerly known as Wheaton Inc., Plaintiff-Respondent,
v.
Douglas Frederick SMITH, a/k/a Douglas F. Smith and Anthony D. Smith, Trustee for Douglas Frederick Smith, Defendants, and
Susan Huffard Ball; P. Phillippi Huffard, IV; Trevor Lansing Huffard; Whitney Lancaster Huffard; Courtney Montagu Huffard; Robert D. Robertson, a/k/a Robert Shaw; Frank H. Wheaton, III, a/k/a Frank H. Wheaton III; Frank H. Wheaton, III, custodian for Christopher Bainbridge Wheaton; Ada A. Strasenburgh; James A. Strasenburgh; John B. Strasenburgh; John Griffin Strasenburgh; John B. Strasenburgh, Trustee for John Griffin Strasenburgh, Jr.; John B. Strasenburgh, Trustee for Blair Baldwin Strasenburgh; Louise Houghton Strasenburgh; John B. Strasenburgh, Trustee for Sarah Houghton Strasenburgh; John B. Strasenburgh, Trustee for Toby E.A. Strasenburgh; Sally Strasenburgh Applegate Lane; John B. Strasenburgh, Trustee for Samuel Church Applegate; John B. Strasenburgh, Trustee for Amos Eighmy Applegate; John B. Strasenburgh, Trustee for George Guthrie Applegate; John B. Strasenburgh, Trustee for Allison Webb Strasenburgh; and John B. Strasenburgh, Trustee for Oliver James Strasenburgh, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 1998.
Decided August 26, 1998.
*551 Frederick L. Whitmer, Morristown, for all defendants-appellants except Frank H. Wheaton, III, Individually and as Custodian for Christopher Bainbridge Wheaton and Amanda Elizabeth Wheaton and Robert D. Robertson, a/k/a Robert Shaw (Pitney, Hardin, Kipp & Szuch, attorneys; Mr. Whitmer, on the brief).
Marc J. Sonnenfeld, Philadelphia, PA, for defendants-appellants Frank H. Wheaton, III, Individually and as Custodian for Christopher Bainbridge Wheaton and Amanda Elizabeth Wheaton and Robert D. Robertson, a/k/a Robert Shaw (Morgan, Lewis & Bockius, attorneys; Robert A. White, Princeton, and Mr. Sonnenfeld, on the brief).
Jesse A. Finkelstein, Wilmington, DE (Richards, Layton & Finger) of the Delaware bar, admitted pro hac vice, for plaintiff-respondent (Kenney & Kearney, and Mr. Finkelstein, attorneys; Joseph H. Kenney, Cherry Hill, appearing and with Mr. Finkelstein on the brief).
Before Judges KING, MUIR, Jr., and CUFF.
The opinion of the court was delivered by CUFF, J.A.D.
Twenty-six shareholders of closely held Wheaton Inc. invoked their right to an appraisal and purchase of their shares pursuant to N.J.S.A. 14A:11-1 to -11. They had dissented from a corporate restructuring. Their appeal of the valuation of those shares primarily raises the issue of whether a discount *552 to reflect the lack of marketability of the shares of this closely-held corporation should be applied.
The Wheaton Glass Company was founded in 1888 by Theodore Carson Wheaton. Throughout the years, Wheaton has remained a privately-held, family-controlled business. As shares have been passed down from generation to generation, the number of individual shareholders has increased to 159, and the number of shares to over five million. The dispute in this case involves the third and fourth generation of Theodore C. Wheaton's descendants.
Wheaton's headquarters is located in Millville. The company is a producer of glass and plastic containers, closures and components; tubing products; molded rubber products and aluminum seals; and related scientific and medical products. It serves the pharmaceutical, cosmetic, personal care, scientific/medical and food industries. Its largest customers included Avon, Eli Lilly and Revlon. By 1991, Wheaton's operations were divided into seven groups: glass, plastics, scientific, international, machinery, corporate, and miscellaneous.
Wheaton experienced its best financial year in 1989, as a result of securing a patent on a new type of plastic molding process. However, the company began experiencing significant operational problems in 1990 because of loss of sales in its plastics business and an investigation by the Internal Revenue Service into use of the company's assets by certain individuals. By 1991 the company was having problems passing through price increases to its customers. In addition, in January 1991, Frank Wheaton, Jr., the long-term President of the corporation, took a leave of absence under pressure, and the board of directors appointed Robert Veghte as President and Chief Executive Officer of the company.
Because of the changes in personnel and in the financial climate, in early 1991 management held a series of informal meetings with the shareholders. At these meetings, the third generation shareholders expressed the desire that the company play a greater role in estate tax management. Defendants Frank Wheaton III and James Strasenburgh were particularly vocal on this issue. As a result, Veghte, with board approval, developed a shareholder liquidity plan that was sent to, and approved by, a majority of the shareholders in April 1991. Frank Wheaton III and Strasenburgh did not vote in favor of this plan. Under the plan, shareholders were to receive the required liquidity to pay federal estate and gift taxes; in return, the shareholders agreed to give the company a right of first refusal for any proposed transfer of their Wheaton shares outside the line of Theodore C. Wheaton's descendants and spouses. The board also asked corporate counsel to come up with ideas to allow for further shareholder liquidity. Additionally, around this time, Veghte met with Frank Wheaton III and James Strasenburgh, who indicated their intention to sell their shares. However, while Strasenburgh was willing to sell his shares to the company, Frank Wheaton III wanted to sell his shares to an outside buyer.
At Wheaton's annual meeting on June 11, 1991, Veghte presented several alternatives for providing current liquidity to shareholders. Among the alternatives presented was an employee stock option plan, whereby Wheaton would have incurred approximately $100 million in debt to buy 30% of the common stock of the company at approximately $66 per share. Ultimately, this alternative was rejected because of the significant debt load that the corporation would assume. Other alternatives which were considered and rejected were a declaration of a large, one-time dividend and sale of the entire company to a third party. Another alternative which received considerable interest was a limited initial public offering (IPO), whereby limited voting common shares would be sold to the public so that the Wheaton family would retain control of the company.
In July 1991, the company sent a survey to the shareholders regarding the proposed public offering. Approximately seventy percent of the shareholders responded to the survey. Most expressed interest in the IPO but expressed a reluctance to part with their shares in order to create the offering. As a result of the survey, the company proceeded to solicit bids for an IPO. Three investment *553 bankers made presentations for a limited IPO, with estimates of per share value ranging from $57 to $68. Wheaton chose First Boston Corporation, Inc. (First Boston) to manage the IPO in the event the board decided to so proceed. However, because of ensuing budgetary and environmental problems affecting the company in the second half of 1991, as well as general financial market conditions, plans for an IPO were delayed.
In early August 1991, Bowater, Inc., a British company, purchased 100,000 shares of Wheaton stock from the former Wheaton President, Frank H. Wheaton, Jr., at $64 per share and secured options for an additional 17.66% of the company's common stock. Frank Wheaton, Jr.'s sale to Bowater was the first instance of a sale of Wheaton stock to a non-family member. On August 14, 1991, Bowater made an offer to purchase Wheaton for $64 per share; Bowater's board of directors had authorized a bid as high as $70 per share. The offer was subject to adjustment based upon due diligence and Wheaton's financial results to date in 1991. Soon thereafter, Veghte met with Bowater's principals to discuss the offer. Veghte told Bowater's principals that based on First Boston's IPO price range he believed $64 per share was too low. On August 28, 1991, Wheaton's board of directors rejected the offer and unanimously adopted a resolution stating that the company was not for sale.
On that same date, 71% of Wheaton's shareholders agreed to and signed a shareholder's agreement which restricted the sale of company stock to any outside party unless the transfer was approved by both 75% of the shareholders and five of the six members of a newly-created shareholder committee. No defendant signed the agreement.
On October 3, 1991, Veghte and George Straubmuller met with the chairman of Bowater in London and offered to repurchase its shares at $64 per share plus expenses. Bowater rejected the offer.
In the fall of 1991, Wheaton discovered fraud at one of its wholly-owned subsidiaries, American International Container (AIC), which resulted in a financial loss to the Florida subsidiary of $13 million. According to Veghte, this development was an additional reason for Wheaton's failure to proceed with an IPO.
As part of the plans for an IPO, and for certain tax advantages, First Boston advised Wheaton to restructure the company and become a Delaware corporation. Ultimately, however, while Wheaton decided to restructure, only one of its newly-created subsidiaries, a holding company, became a Delaware corporation. Under the restructuring plan, Wheaton would change its name to Wheaton Inc., three new wholly-owned subsidiaries would be formed, Wheaton Science Products, Wheaton Industries, Inc. and Wheaton Holding, Inc., and the company would transfer substantially all of its assets to the subsidiaries in exchange for 100% of each subsidiary's stock. In return for their existing shares, each Wheaton shareholder would be issued recapitalized shares in the new company on a share-for-share basis. On November 20, 1991, the restructuring plan was approved by the board. The board then solicited shareholder approval for the plan. On December 6, 1991, the board received approval of the plan from holders of more than two-thirds of the outstanding stock. On the day prior to adoption of the restructuring plan, defendants, a group of twenty-six shareholders, holding approximately 15% of the company's outstanding five million shares, formally dissented from the plan pursuant to the appraisal statute and demanded fair value payment for their shares. The dissenting shareholder with the largest percentage of shares is Frank Wheaton III with 4.4%; Frank Wheaton, Jr., is the next largest with 2.6%.
In January 1992, twenty of the twenty-six dissenting shareholders brought an action (hereinafter, the shareholder action) against Wheaton's board of directors alleging that the directors abused their positions by misappropriating corporate assets and opportunities, misusing company funds, and deflating the value of the company stock. Strasenburgh v. Straubmuller, 146 N.J. 527, 533-34, 683 A.2d 818 (1996). Subsequently, the defendants' motion to dismiss the complaint in the shareholders' action was granted on the ground that the shareholders' claims, if valid, were derivative, not direct, claims. Id. at 534-35, 683 A.2d 818.
*554 In the latter part of January 1992, Wheaton retained First Boston to conduct a fair value appraisal of the company. First Boston valued Wheaton shares between $36.87 and $42.53 per share. At a meeting of the board of directors on February 28, 1992, it was determined that the company would offer to purchase the dissenters' shares for $41.50 per share. On March 2, 1992, this offer was communicated to the dissenters but was not accepted. Rather, the company was asked to proceed with the appraisal action. Accordingly, on April 23, 1992, Wheaton filed a complaint seeking determination of fair value pursuant to N.J.S.A. 14A:11-7 (hereinafter, the appraisal action). On May 26, 1992, the twenty-six dissenting shareholders (defendants) filed an answer and counterclaim. Because of this litigation, and the fraud in the company's Florida subsidiary, Wheaton was advised by First Boston not to proceed with the IPO.
On March 25, 1993, Judge Francis entered an order, designated as a final judgment for purposes of execution remedies and appeal, granting defendants' motion for an advance of funds of the payment of fair value in the amount of $1.10 per share for the period of January 28, 1992 through January 7, 1993, and $.25 per share on a quarterly basis beginning April 1, 1993. On June 30, 1995, Judge Francis granted defendants' motion to increase, retroactively to September 6, 1994, the advance paid to defendants from $.25 per share to $.29 per share of Wheaton stock held by defendants on December 5, 1991.
In June 1995, Wheaton's board of directors voted to rescind the corporate restructuring which had triggered the appraisal action in an effort to avoid the financial ramifications of a fair value payment because it then appeared to management that the company's financial situation had declined to the point where it could not get financing for the appraisal purchases. Then, Wheaton sought to dismiss the appraisal action, but the trial court denied that motion on June 30, 1995. On August 2, 1995, this court denied Wheaton's motion for leave to appeal that decision.
On August 8, 1995, this court issued a decision in the shareholder action largely reversing the trial court's dismissal of the shareholders' complaint. Strasenburgh v. Straubmuller, 284 N.J.Super. 168, 664 A.2d 497 (App.Div.1995). Trial in the appraisal action had commenced the previous day, August 7, 1995, and continued over thirty dates in August, September, October, November and December 1995, and February 1996.
On December 7, 1995, the Supreme Court granted certification in the shareholders' action. 143 N.J. 324, 670 A.2d 1065 (1995). In January 1996 Wheaton sought to dismiss the appraisal action based on retroactive application of amendments to the New Jersey Business Corporation Act which eliminated the type of restructuring undertaken by the corporation as a triggering event for the appraisal/purchase statutory remedy. The trial court denied the motion on January 26, 1996.
On April 24, 1996, the Supreme Court granted Wheaton's motion for leave to appeal the denial of the rescission motion and granted Wheaton's motion for direct review of the denial of the retroactivity motion.
On May 1, 1996, Wheaton announced an acquisition merger with Alusuisse-Lonza Holding Ltd. (A-L), a Swiss holding company, effective April 29, 1996, whereby Wheaton shareholders would receive $63 per share from A-L. Strasenburgh, supra, 146 N.J. at 536-37, 683 A.2d 818.
On October 23, 1996, the Supreme Court issued its decision in Strasenburgh, supra. In that decision, the Court reversed this court and held that the shareholders' action had to be brought derivatively, id. at 548-55, 683 A.2d 818, and affirmed the denial of both Wheaton's rescission and retroactivity motions. Id. at 538-46, 683 A.2d 818. With respect to the appraisal action, the Court remanded the matter to the trial court for consideration of the events that transpired after trial in that action had concluded, id. at 545-46, 683 A.2d 818, and to "take control of the remaining matters in controversy and conclude them as rapidly as is feasible." Id. at 532, 683 A.2d 818.
Pursuant to the Supreme Court's decision, at the end of October 1996, defendants asked the trial court to reopen the record to take account of the merger. Judge Francis denied this motion. On February 28, 1997, *555 Judge Francis issued a written decision. He concluded that the fair value of a share of Wheaton stock as of December 5, 1991, was $41.05, and he awarded simple interest at the rate of 8.24%.

I
Defendants argue that the trial court abused its discretion by not reopening the record for consideration of the price of Wheaton's 1996 sale in order to demonstrate that the fair value of the company was greater in 1991 than in 1996. In other words, defendants sought to establish that if the company was worth $63 per share in 1996, then it was worth more than that in 1991 when the company's earnings, as reflected by its financial statement, were greater, and that as a consequence, the trial court's per share valuation of $41.05 was far too low. Defendants also point to the fact that the court allowed certain post-December 5, 1991 evidence into the record, namely, the company's financial statement for the year ending in 1991 and the company's budget for the year 1992. They ask that this matter be reversed and remanded for a redetermination of fair value with instructions to reopen the record to consider the 1996 $63 per share acquisition price.
In arguing that the trial court did not abuse its discretion, Wheaton cites the language of the Supreme Court opinion as well as the language of the appraisal statute. In Strasenburgh, supra, the Supreme Court stated:
We direct ... that the trial court be permitted in its discretion to reopen the record in the appraisal proceedings for consideration of events that have transpired since the hearing closed. Specifically, the trial court may take into account the position of Wheaton's directors in the North Jersey litigation that the court in the appraisal proceeding may consider whether the conduct of the directors had artificially depressed the value of the stock.... The court may also consider the company's recent merger in making a just and equitable determination of the appraisal value as of 1991. Before us, the company argued that its financial condition had deteriorated between 1991 and 1996. We realize that the trial court in the appraisal action has determined to limit proofs to the events at the time of the December 1991 valuation. We surmise that these matters of artificial deflation of stock values were fully canvassed in that proceeding and if the court is satisfied to enter judgment on the record before it, it may do so.
[Strasenburgh, supra, 146 N.J. at 545-46, 683 A.2d 818.]
In rejecting defendants' request, Judge Francis cited his prior rulings that the only proofs he would consider as to fair value were those known or knowable as of December 5, 1991. He further stated:
The acquisition price paid by A-L on or about May 22, 1996 was neither known nor knowable as of December 5, 1991. To open the record again to consider the acquisition price and proxy materials, et cetera, would ... in my opinion either force me to reopen the record for any and all events occurring subsequent to December 5, 1991 not known or knowable on that date or just consider one isolated or selective event and then attempt to somehow relate it to what fair value otherwise was as of December 5, 1991.... [I]t seems to me that I made the correct evidential delineation as of the trial and should stick with it now.
To let in the merger price I think would force me to then allow the company to bring in any events that it thinks could somehow be related to December 5, 1991 but again not known or knowable as of that date in ultimately determining fair value as of December 5, 1991. Such a process would certainly not permit me to take control of the case as also directed by the Supreme Court and conclude it "as rapidly as is feasible." Instead [it] would cause me to conduct a renewed hearing for at least a number of days, if not weeks....
Moreover ... to limit the proofs to just the merger price and the proxy materials and the like would place und[ue] emphasis on the $63.00 merger price without any consideration of what part of that price constitutes either a control premium *556 and/or synergies and if I were to reopen the record limited to what the company seeks I would at a minimum have to allow the company to discover from both Wheaton and probably A-L as well, if not more so, what it based its $63.00 price on.
Hence, I deny the dissenters' motion to reopen the record.
The appraisal statute limits proof as to fair value to the time of the corporate action, and excludes any appreciation or depreciation resulting from the action. N.J.S.A. 14A:11-3(3)(a). Defendants point to the fact that at trial the court allowed into evidence financial statements for the year ending December 29, 1991, Wheaton's budget for the year 1992 and evidence of the financial decline of the company as part of Wheaton's effort to justify its June 1995 rescission of the restructuring. However, for purposes of determining fair value as of early December 1991, there is a great temporal difference between end-of-year 1991 financial statements and projected budgets for 1992 and a mid-1996 sale. Defendants concede that the remaining evidence they cite regarding the rescission did not relate to the valuation question. Furthermore, contrary to defendants' arguments, the Supreme Court did not indicate its preference regarding the admissibility of the A-L merger. Rather, it clearly left the reopening issue within the trial court's discretion. Our review of this voluminous and complex record demonstrates no abuse of the discretion reposed in the trial judge.

II
The $41.05 share valuation reached by the trial judge was predicated on two primary factors: application of a 25% lack of marketability discount and fixing the embedded minority discount at zero. All defendants appeal the application of a marketability discount. In addition, defendants Frank Wheaton III and Robert Shaw contend that the trial judge erred in fixing the embedded minority discount at zero. They insist that the trial judge was obliged to remove the acknowledged embedded minority discount, thereby raising the value of the stock. We will address each issue separately.

A. THE MARKETABILITY DISCOUNT.
In maintaining that the trial court erred in applying a marketability discount, defendants make the following assertions: most jurisdictions that have considered the issue have rejected such a discount; the discount would create a disincentive for a shareholder to dissent from a corporate action; the trial court's decision places defendants in a subordinate position to the other Wheaton shareholders who received $63 a share when the company was sold; and there was no need for a marketability discount because the company itself was purchasing the shares. Defendants ask this court to reverse the trial court's valuation order and remand the matter for a recalculation of fair value on an undiscounted basis.
Frank Wheaton III and Shaw largely echo this argument. In addition, these defendants contend that in applying the marketability discount the trial court improperly transformed the concept of "fair value" into "fair market value" by injecting marketability concerns into the valuation process, and that application of the marketability discount was contrary to the equitable nature of the appraisal statute by penalizing the dissenters and rewarding the majority.[1]
The company maintains that the trial court was correct in applying a marketability discount because the discount reflected the reality of the market for Wheaton's shares, namely, the fact that there was no readily *557 available market for the shares. In support of its position, the company asserts that most states that have considered the issue have applied marketability discounts and that not applying the discount in this instance would punish Wheaton for the illiquidity of its stock and unjustly reward defendants.
Before proceeding to the question of the applicability of the marketability discount, some preliminary observations regarding the appraisal process are in order. The appraisal process for shareholders dissenting from certain corporate actions, with its requisite determination of fair value, came about as a result of the historical growth of the modern corporation. As one court has observed:
The traditional rule through much of the 19th century was that any corporate transaction that changed the rights of common shareholders required unanimous consent. The appraisal remedy for dissenting shareholders evolved as it became clear that unanimous consent was inconsistent with the growth and development of large business enterprises. By the bargain struck in enacting an appraisal statute, the shareholder who disapproves of a proposed merger or other major corporate change gives up his right of veto in exchange for the right to be bought outnot at market value, but at "fair value."
[In re Valuation of Common Stock of McLoon Oil Co., 565 A.2d 997, 1004 (Me.1989).]
Thus, in its current form, "[a]n appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1186 (Del. 1988). "The appraisal remedy has deep roots in equity." McLoon Oil, supra, 565 A.2d at 1004.
New Jersey's appraisal statute gives any shareholder the right to dissent from certain corporate actions, such as mergers, consolidations or sale or exchange of corporate assets. N.J.S.A. 14A:11-1. A dissenting shareholder wishing to invoke the statute is required to inform the corporation of his dissent and his intention to demand payment for his shares. N.J.S.A. 14A:11-2. Upon invoking the appraisal statute, "the dissenting shareholder shall cease to have any of the rights of a shareholder except the right to be paid the fair value of his shares and any other rights of a dissenting shareholder under this Chapter." N.J.S.A. 14A:11-3(2). "Fair value" is determined "[a]s of the day prior to the day of the meeting of shareholders at which the proposed action was approved or as of the day prior to the day specified by the corporation for the tabulation of consents to such action if no meeting of shareholders was held," and shall exclude any appreciation or depreciation resulting from the proposed action. N.J.S.A. 14A:11-3(3). The statute is designed to afford a simple and expeditious remedy to the dissenting shareholder and is to be liberally construed. Bache & Co. v. General Instrument Corp., 42 N.J. 44, 51, 198 A.2d 759 (1964).
At the time of the corporate action in question, defendants were entitled to the benefit of the appraisal statute. However, the appraisal statute was amended subsequently by L. 1995, c. 279 to exclude corporate transfers of any or all of its assets to another corporation that is owned by the parent corporation, N.J.S.A. 14A:10-11(4); N.J.S.A. 14A:11-1(1)(b), precisely the type of transfer which occurred in this instance.
The authors of the appraisal remedy abandoned the more restrictive standard of "fair market value" in favor of the broader and more flexible test of "fair value" found in the Model Act. Commissioners' Comment to N.J.S.A. 14A:11-3 (1968). This accords with statutes in other jurisdictions. See, e.g., Walter S. Cheesman Realty Co. v. Moore, 770 P.2d 1308, 1311 (Colo.Ct.App.1988) (the term "fair value" as used in the dissenters' rights statute imports a broader approach to valuation than does the term "fair market value"); Columbia Management Co. v. Wyss, 94 Or.App. 195, 765 P.2d 207, 212 (1988) ("except in a few jurisdictions ... `fair value' does not mean `fair market value.' Market value is, at most, one factor in determining fair value"), review denied, 307 Or. 571, 771 P.2d 1021 (Or.1989). The distinction between *558 "fair value" and "fair market value" is important and relates to the nature of the appraisal remedy. As has been observed:
"Fair value" is not the same as, or short-hand for, "fair market value." "Fair value" carries with it the statutory purposes that shareholders be fairly compensated, which may or may not equate with the market's judgment about the stock's value. This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value.
[J. Anthony & K. Boraas, Betrayed, Belittled... But Triumphant: Claims of Shareholders in Closely Held Corporations, 22 Wm. Mitchell L.Rev. 1173, 1186 (1996) ].
The New Jersey statute is silent on the meaning of the term "fair value." However, this is not unusual. The value standards as they relate to dissenters appraisals in closely-held corporations are clearly defined in only two state statutes. Cal. Corp.Code § 1300 (West 1998) ("fair market value"); Ohio Rev.Code Ann. § 1701.85(C) (Baldwin 1998) ("fair cash value," defined as the amount that a willing seller, under no compulsion to sell, would be willing to accept, and that a willing buyer, under no compulsion to purchase, would be willing to pay). Consequently, we generally look to case law for definitions of fair value. Moreover, determination of fair value is not an exact science, as has been observed:
[T]here are no hard and fast rules for determining the fair value of dissenters' shares. The determination must take into account the various approaches to evaluating corporate assets, earnings and business prospects without regard to the events that triggered the dissent. It must reflect that a necessary result of dissenting is the dissenters' loss of their opportunity to share in the corporation's prospects. It should also recognize the legislative purpose of protecting dissenters from the effects of changes that they can neither influence nor control.

[Wyss, supra, 765 P.2d at 212.]
See also Walter S. Cheesman, supra, 770 P.2d at 1311 ("A judicial determination of fair value is not susceptible of determination by any precise mathematical formula, and certain approaches to valuation may not present a reliable measure of value in a particular case").
In New Jersey, assessment of fair value requires consideration of "proof of value by any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court." Dermody v. Sticco, 191 N.J.Super. 192, 196, 465 A.2d 948 (Ch.Div.1983) (quoting Weinberger v. UOP, Inc., 457 A.2d 701, 713 (Del. 1983)). Thus, New Jersey has adopted Delaware's rejection of that state's former method of valuation known as the "Delaware block" or weighted average method wherein asset value, market price and earnings were assigned a particular weight and the resulting amounts added to determine the value per share. Weinberger, supra, 457 A.2d at 712.[2] The value derived from a market price analysis, standing alone, cannot be determinative of fair value. It is, however, a valuable corroboration tool. Dermody, supra, 191 N.J.Super. at 199, 465 A.2d 948.
Wheaton's designated expert was George Weiksner, a managing director and chairman of First Boston's investment banking committee. Weiksner defined fair value as the price at which a willing buyer and a willing seller would engage in a purchase and sale of the shares of a company, both having full knowledge of the relevant facts, and neither under the compulsion to buy or sell. In determining the fair value of the dissenters' shares, Weiksner utilized a two-step process. First, he estimated Wheaton's liquid value as if it were a fully distributed, publicly traded corporation by considering the stock market trading values of comparable companies. He noted that although Wheaton's 1991 performance, even accounting for certain unusual charges, represented a significant deterioration from its 1990 results, the company was projected to return to a more robust level in *559 1992. Weiksner compared Wheaton to five comparable public companies, from which he derived a price/earnings multiple of 13 to 18. As to comparable corporations, Weiksner selected The West Company, Inc., the world's largest manufacturer of specialized packaging components for the pharmaceutical and hospital supply/medical device industries, as the most comparable company.
Weiksner then determined Wheaton's estimated 1992 earnings by accepting the company's projected 1992 earnings of $23.8 million but reducing it to $20.5 million to account for Wheaton's poor year in 1991, thereby reducing the company's projected sales revenues by $5 million. In addition, Weiksner believed that Wheaton's budgetary process was unsophisticated and noted the competitive environment in the packaging industry. Weiksner further cited the generally poor market conditions that existed in early December 1991, including, postponement and cancellations of several IPOs and a decline in the stock market.
Weiksner questioned the reliability of the Bowater offer because the offer was subject to further investigation and because of Wheaton's declining performance after the offer had been made, as well as the fraud discovered at AIC.
Weiksner also utilized a discounted cash flow analysis, which resulted in a value of $57 to $68 per share, and a comparable acquisitions analysis, which resulted in a value of $57 to $63 per share. Taking into account all these factors, Weiksner estimated the liquid trading range for Wheaton stock as of December 5, 1991, to be $52.65 to $56.70 per share.
As a second step, Weiksner applied a 25% discount to reflect the fact that Wheaton was a private company without a readily accessible liquid trading market, and an additional five percent discount due to the restrictions on stock transfers contained in the shareholder's and liquidity agreements. Therefore, he concluded that the fair value of the company was between $36.86 and $39.69 per share.
Defendants' valuation expert was Mark Lee, managing director in the investment banking department of Bear Stearns and Company. In determining the fair value of the dissenters' shares, Lee utilized three valuation standards: pro rata equity value, whereby the value of the company is examined as a going concern without any premiums or discounts; minority interest value, whereby the market value of the stock of the company reflects a discount to reflect the minority interest; and discounted minority interest value, whereby a discount is applied to the lack of marketability of the stock of a close corporation. In conjunction with these standards, Lee used the following methodologies: market value, where prior sales, offers, appraisals or estimates of value were examined; going concern value based on comparison with publicly traded glass and plastic specialty manufacturers; and going concern value based on acquisitions of comparable glass and plastic specialty packaging manufacturers. Lee did not use liquidation value because he believed Wheaton's highest and best use was as a going concern and did not use discounted cash flow because there was no long-term projection of the company's future earnings available.
In determining fair value, Lee utilized the financial statements and performance of the company from 1980 to 1991, and analyzed the company's projected budget for 1992. He determined Wheaton's operating cash flow margin to be 13.8%. Lee came up with three value ranges: $67 to $75 per share based upon the pro rata equity value; $62 to $65 per share based upon the minority interest value; and $51 to $59 per share based upon the discounted minority interest value, with the discount being between 10% and 17%. Lee estimated Wheaton's freely traded value as between $62 and $65 per share and its price/earnings ratio as between 13.2 and 13.8, with 13.5 as an average. Lee relied on seven public companies as comparables. Like Weiksner, Lee found The West Company, Inc. to be the most comparable. Given previous studies, Wheaton's size and profitability, as well as its reported intention to go public, Lee fixed the marketability discount at between 10% and 17%. Lee then determined the restricted value as between $51 and $59 per share.
*560 Lee preferred pro rata equity value because that was based on treating all shareholders equally and thereby allocating the company's equity value in proportion to the shareholders' interests, and because it was the standard of fair value for dissenters in appraisal actions in Delaware. He determined pro rata value based on the acquisition method. The other two methods, according to Lee, would result in a windfall to the majority shareholders.
Lee described 1991 as an "atypical" year in terms of the company's performance in that Wheaton's 1991 income statement had over $38.7 million in unusual and non-recurring expenses, including: $13 million for thefts and mismanagement at one of its subsidiaries, American International Container; $4 million in legal expenses; and $4.6 million in restructuring and reorganization expenses. In determining acquisition value, Lee examined the acquisitions of seven glass or plastic businesses since the beginning of 1987. Based on this data, Lee determined the acquisition value to be between $67 and $75 per share. Lee conceded that the only differences between his valuation and Weiksner's valuation were the $5 million "haircut" and application of the marketability discount.
Judge Francis also observed the similarity of their analysis; he stated:
They're really not all that different. Both experts used the comparable company methodology to establish freely-traded or market value. They both worked off of initially, at least, Wheaton's projected or forecasted earnings for 1992 and then applied a multiple to that forecast in one instance, after making some adjustments or calculated the price earnings' ratio of Wheaton for its freely-traded or market or liquid market value.... The Company's expert did adjust Wheaton's 1992 forecast by subtracting the five million dollars from projected gross sales, which ... Mr. Lee did not.... [B]oth experts used the same methodology in arriving at freely-standing... liquid value ... used the same multiple, by and large, and using the price earnings' ratio to calculate freely-traded... liquid value; the differences being solely whether or not the company forecast should be adjusted or whether marketability or minority discounts should be applied.
Notwithstanding the acknowledged similarity of the experts' methodologies and ultimate opinions, Judge Francis initially found that First Boston's method of valuation going concern valuemore sustainable than Bear Stearns utilization of acquisition value. The court observed: "[T]he restructuring which activated appraisal rights was undertaken for tax advantages and in order to proceed with the limited IPO, not in furtherance of a sale of the corporation. This relatively minor change bears no logical relationship to a third-party sale standard of valuation." The court agreed with First Boston that the discounted cash flow method should be disregarded because of a lack of confidence in the projections of Wheaton's earnings between 1993 and 2001. It found First Boston's $5 million reduction of Wheaton's 1992 projected earnings credible because Wheaton missed its estimated 1991 earnings by 40% and the reduced figure was consistent with Wheaton's actual earnings in 1990. With respect to Bowater's $64 per share offer, the trial court found that while the offer had some relevance, it should be accorded little weight because it was based on faulty assumptions regarding Wheaton's earnings in 1991 and 1992. The court placed great weight on the fact that on December 5, 1991, the stock market was near the bottom of a fourth quarter 1991 decline, and that a number of proposed IPOs were postponed or indefinitely pulled due to the unfavorable market condition.
The court proceeded to apply a 25% marketability discount, relying on the American Law Institute's Principles of Corporate Governance. 2 ALI, Principles of Corporate Governance, § 7.22 (1992). The court stated:
[T]he restructuring was a harmless action and done in order to prepare for a limited IPO to give the dissenters as well as some other shareholders the liquidity they sought. To allow it to bestow upon the dissenters a price significantly higher than any shareholder could have obtained in a market transaction under such circumstances would bring about an unfair wealth transfer from the remaining shareholders *561 to them unless a discount for non-marketability was applied. Put bluntly, the dissenters exploited a change they themselves championed and possibly prevented an IPO to the detriment of other shareholders. Since the situation falls within the ALI exception for extraordinary circumstances, I need not decide whether a non-marketability discount should or should not be applied generally in appraisal actions.
Accordingly, the court concluded that the fair value of a share of Wheaton stock, as of December 5, 1991, was $41.05. It arrived at this figure by multiplying its estimate of Wheaton's 1992 earnings$20.5 millionby 13.5, the average of the price/earnings multiples used by the experts, adding that figure to the amount of Wheaton shares outstanding on the date in question, and then subtracting the 25% marketability discount.
The parties dispute the appropriate standard of review. Wheaton believes that this appeal presents a mixed question of law and fact requiring a substantial credible evidence and abuse of discretion standard. Defendants believe this appeal presents a question of law requiring de novo review.
A trial court's determination of value in a statutory appraisal proceeding is accorded a high level of deference which will be overturned only if the trial court abuses that discretion, as when its factual findings do not have support in the record and its valuation is not the result of an orderly and logical deductive process. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974); Balsamides v. Perle, 313 N.J.Super. 7, 13, 712 A.2d 673 (App.Div.1998); Rapid-American Corp. v. Harris, 603 A.2d 796, 802 (Del.1992). However, the propriety of applying a discount or premium to the valuation reached is a question of law to be reviewed de novo. Rapid-American, supra, 603 A.2d at 804; see also Balsamides, supra, 313 N.J.Super. at 26, 712 A.2d 673. Thus, this appeal presents both a question of fact and a question of law; however, in light of the fact that the application of certain discounts is the main issue, it is primarily a question of law. See Amerada Hess Corp. v. Commissioner of Internal Revenue, 517 F.2d 75, 82 (3d Cir.1975) (while the computation of the actual dollar worth of the stock is a question of fact not to be disturbed unless clearly erroneous, whether the lower court applied the correct standard of valuation applicable to the factual situation is a question of law), cert. denied, 423 U.S. 1037, 96 S.Ct. 574, 46 L. Ed.2d 412 (1975). Cf. King v. F.T.J., Inc., 765 S.W.2d 301, 305 (Mo.Ct.App.1988) (under Missouri law the application of a marketability discount in determining fair value rests within the sound discretion of the trier of fact after every relevant fact and circumstance is considered). Moreover, as noted by the trial court in its opinion, both sides agreed that the applicability of a marketability discount was a matter of law.
In general, the concept of a marketability discount stems from the fact that marketability problems often affect shares of closely-held corporations, and that as a result, a discount should be applied to reflect the illiquidity of such shares. 12B Fletcher Cyclopedia of Corporations, § 5906.120 (perm. ed.1993). This illiquidity is the result of the fact that there is no large pool of potential buyers for these businesses when they come on the market; consequently, the longer it takes to sell an asset, the lower its ultimate value will be and such businesses must be sold at a substantial discount in order to attract buyers. See James Edward Harris, Valuation of Closely Held Partnerships and Corporations: Recent Developments Concerning Minority Interest and Lack of Marketability Discounts, 42 Ark. L.Rev. 649, 657 (1989). Thus, a discount for lack of marketability has been justified on the ground that the shares of a closely-held corporation cannot be readily sold on a public market, regardless of whether or not the shares in question represent a minority interest. Blake v. Blake Agency, Inc., 107 A.D.2d 139, 486 N.Y.S.2d 341, 349 (N.Y.App.Div.), appeal denied, 65 N.Y.2d 609, 494 N.Y.S.2d 1028, 484 N.E.2d 671 (1985); see also Harry J. Haynsworth, Valuation of Business Interests, 33 Mercer L.Rev. 437, 489 (1982) (an astute investor will pay less for an interest that cannot be freely traded, and a discount to compensate for this illiquidity factor is *562 well established); Anthony and Boraas, supra, 22 Wm. Mitchell L.Rev. at 1191 ("[a] discount for lack of marketability ... reflects the fact that investors will pay less for an interest that cannot be freely traded, as it would be if listed on an organized exchange"). However, a marketability discount is different from a minority discount: "Marketability discounts are applied to all the stock of a corporation that is not widely traded, whereas minority fair market value discounts only apply to minority shareholders." Robblee v. Robblee, 68 Wash.App. 69, 841 P.2d 1289, 1294 (1992); see also Balsamides, supra, 313 N.J.Super. at 26, 712 A.2d 673. While minority discounts are downward adjustments to the value of dissenting shares due to their lack of voting power to control corporate actions, marketability discounts are downward adjustments to the value of shares due to the limited supply of potential buyers. Paul Gordon, Comment, Submitting "Fair Value" to Final Offer Arbitration, 63 U. Colo. L.Rev. 751, 766-67 (1992).[3]
The subject of discounts in general, and the marketability discount in particular, has received scant attention in New Jersey, and courts have reached different conclusions as to their applicability. Compare Tracy v. Alexander, 17 N.J. 397, 405, 111 A.2d 492 (1955) (recognizing, in the context of valuing a minority stock interest in a corporation for transfer inheritance tax purposes, the "necessity" for a minority discount), with In re Estate of Post, 282 N.J.Super. 59, 77-78, 659 A.2d 500 (App.Div.1995) (minority discount held not permissible when a liquidation approach is used to value a decedent's interest in a corporation for elective share purposes), and Lavene v. Lavene, 162 N.J.Super. 187, 202, 392 A.2d 621 (Ch.Div.1978) (holding that it would not be appropriate to apply a discount to reflect a husband's minority interest in a closely-held corporation for equitable distribution purposes). The disparity in treatment is likely attributable to the context which requires valuation rather than an acceptance or rejection of the concept in theory.
Recently, in the context of a dissolution action pursuant to N.J.S.A. 14A:12-7, another panel of this court concluded that a marketability discount should not be applied when the shares are being acquired by the other stockholder rather than an outsider. Balsamides, supra, 313 N.J.Super. at 28-29, 712 A.2d 673. In Balsamides, the owner of fifty percent of the shares of a closely-held corporation commenced an action to dissolve the corporation and to require the other shareholder to surrender his stock at a price determined by the court. The primary issue was one of valuation. We recognized that a determination of fair value pursuant to N.J.S.A. 14A:12-7(8)(a) is extremely difficult. Id. at 19, 712 A.2d 673. The panel also recognized that if a minority interest in a closely-held corporation is sold to an outsider, a marketability discount is usually applied. Id. at 26, 712 A.2d 673. We also acknowledged that there was a considerable debate regarding the applicability of the marketability discount under circumstances in which the shares of dissenting stockholders are acquired by the corporation. Id. at 28, 712 A.2d 673. In concluding that a marketability discount is inappropriate when one owner transfers his or her interests to another owner, who in turn becomes the corporation's sole shareholder, we said:
Our statute directs that the price of the shares "shall be their fair value as of the date of commencement of the action or such earlier or later date deemed equitable by the court, plus or minus any adjustments deemed equitable by the court if the action was brought in whole or in part under paragraph 14A:12-7(1)(c)." It is neither "fair" nor "equitable" for the surviving shareholder to obtain the selling shareholder's interest at a discount. If there has been a fair appraisal of the fair market value of the entire corporation which will be owned in full by the surviving shareholder, it serves neither fairness nor equity to require a fifty percent shareholder to receive less than half of this total figure. The marketability of the total corporation is incorporated into the original determination of fair market value, and *563 there is no reason to apply any minority discount.

[Id. at 29, 712 A.2d 673.]
Out-of-state case law reveals a division of opinion as to the applicability of the marketability discount in dissenting shareholder appraisal actions. Compare Perlman v. Permonite Mfg. Co., 568 F.Supp. 222, 231-32 (N.D.Ind.1983) (applying marketability discount in determining "fair market value" of dissenting shareholders' stock), aff'd, 734 F.2d 1283 (7th Cir.1984); Stanton v. Republic Bank of South Chicago, 144 Ill.2d 472, 163 Ill.Dec. 524, 581 N.E.2d 678, 682 (1991) (upholding applicability of marketability discount as a matter of trial court's discretion); Ford v. Courier-Journal Job Printing Co., 639 S.W.2d 553, 556 (Ky.Ct.App.1982) (holding that appraiser was free to apply a marketability discount to indicate weight given to the market value of the stock in computing fair value), and Wyss, supra, 765 P.2d at 210, 213 (upholding application of marketability discount in order to reflect potential volatility in a financial services company's "fair market value," the fact that the company's asset value was considerably less than its "fair market value" and the marketability problems affecting the shares of all closely-held corporations), with Hunter v. Mitek Indus., Inc., 721 F.Supp. 1102, 1107 (E.D.Mo.1989) (rejecting application of marketability discount and citing, in support, purpose of the appraisal statute in protecting dissenting shareholders); Cavalier Oil Corp. v. Harnett, 564 A.2d 1137, 1144-45 (Del.1989) (rejecting application of marketability discount as contrary to the requirement that the company be valued as a going concern and as injecting speculation into the appraisal process); McLoon Oil, supra, 565 A.2d at 1004 (rejecting marketability discount because of the equitable nature of the appraisal remedy and the fact that the appraisal statute does not focus on the stock as a commodity but rather as a proportionate part of the enterprise as a whole), and Rigel Corp. v. Cutchall, 245 Neb. 118, 511 N.W.2d 519, 526 (1994) (refusing to apply marketability discount because "[o]nly by not doing so can the statutory policy of fully compensating a dissenting minority shareholder be achieved").
Commentators are likewise divided, although the weight of authority is against applying the discount. Compare Mary Siegel, Back to the Future: Appraisal Rights in the Twenty-First Century, 32 Harv. J. on Legis. 79, 137-38 (Winter 1995) (recommending, "in accordance with a majority of courts that have addressed the issue," that a marketability discount not apply to appraisal-triggering transactions because application of such a discount will require courts to undertake complex and speculative inquiries and provide majority shareholders with inappropriate incentives to activate such transactions); Thomas J. Balmonte, Measuring Stock Value in Appraisals Under the Illinois Business Corporation Act, 80 Ill. B.J. 236, 236-38 (May 1992) (noting that the "weight of authority" is against the imposition of marketability discounts in appraisal proceedings, and that such a discount is inconsistent with the measure of fair value under the Illinois Business Corporation Act because of equitable considerations implicit in the choice of "fair" value as the measure of dissenting shareholder compensation); Haynsworth, supra, 33 Mercer L.Rev. at 489 (asserting inappropriateness of imposing a marketability discount in a dissenters' rights case on the ground that to do so would undercut the purpose of appraisal statutes to give minority shareholders the fair value of their shares), and Gordon, supra, 63 U. Colo. L.Rev. at 767 (noting that appraisal statutes "seem to reject marketability discounts by negative implication") with John D. Emory, Jr., Comment, The Role of Discounts in Determining "Fair Value" under Wisconsin's Dissenters' Rights Statutes: The Case for Discounts, 1995 Wis. L.Rev. 1155, 1157, 1174 (1995) (arguing for the application of the marketability discount on the ground of efficiency, and because to not apply the discount would encourage minority shareholders to reap windfall profits through dissent and litigation thereby making mergers more expensive and less likely to occur).
We conclude that case law and commentators rejecting application of the marketability discount when shares are acquired by the corporation are on firmer ground. The major argument against application of both minority and marketability discounts in appraisal *564 actions has been summarized by the Delaware Supreme Court in Cavalier:
The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." ... Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

[Cavalier, supra, 564 A.2d at 1145.]
See also McLoon Oil, supra, 565 A.2d at 1005.
Furthermore, marketability discounts have been viewed as especially inapplicable to intra-family transfers in closely-held companies, as in this case. Haynsworth, supra, 33 Mercer L.Rev. at 489 n. 92. "In family businesses, the members do not want outsiders to have ownership interests. Thus, the lack of marketability can actually enhance the value of the stock...." Ibid.; see also Morrow v. Martschink, 922 F.Supp. 1093, 1105 (D.S.C.1995) (no marketability discount in dissolution action where the parties subsequently agreed to a buy-out, in part, because stock was being sold to family members). Even Wheaton concedes that the only buyer for the company's shares as a result of the restructuring was the company itself.
In arguing for the applicability of the marketability discount, Wheaton relies on New York law. At least one New York case has upheld application of the discount as within the trial court's discretion. See Quill v. Cathedral Corp., 215 A.D.2d 960, 627 N.Y.S.2d 157, 160 (N.Y.App.Div.) (citing lack of evidence as to marketability as justification for applying the discount), appeal dismissed, 86 N.Y.2d 838, 634 N.Y.S.2d 446, 658 N.E.2d 224 (1995). It is true, as the company points out, that in Strasenburgh, supra, 146 N.J. at 539 n. 4, 683 A.2d 818, the Court noted that in drafting the current appraisal statute the Legislature relied on the comparable New York statute, and that in the absence of relevant New Jersey case law, reliance on New York case law was appropriate. However, it is also true, as Wheaton and Shaw point out, that New Jersey courts will look to Delaware to resolve issues of corporate law. See In re Prudential Ins. Co. Derivative Litig., 282 N.J.Super. 256, 272, 659 A.2d 961 (Ch.Div.1995) (quoting John C. Coffee, Jr. & Adolph A. Berle, Derivative Litigation Under Part VII of the ALI Principles of Corporate Governance: A Review of the Positions and Premises, C852 ALI-ABA 89, 114 (1993)); see also Pogostin v. Leighton, 216 N.J.Super. 363, 373, 523 A.2d 1078 (App.Div.) (observing, where there were no relevant reported New Jersey decisions: "As the issue involved herein is one of corporate law, an appropriate source of reference is the case law of Delaware"), certif. denied, 108 N.J. 583, 531 A.2d 1356, cert. denied, 484 U.S. 964, 108 S.Ct. 454, 98 L. Ed.2d 394 (1987).
Moreover, there are two important distinctions between New York's approach and New Jersey's approach to a determination of fair value. First, unlike New York, New Jersey does not take into account the subsequent economic impact on value of the very transaction giving rise to appraisal rights. Compare Friedman v. Beway Realty Corp., 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972, 976 (1995), with N.J.S.A. 14A:11-3. Second, also as noted above, New Jersey does not restrict valuation to the three major elements of net asset value, investment value and market value cited in Friedman. See Dermody, supra, 191 N.J.Super. at 196, 465 A.2d 948. The company's reliance on Blake, supra, wherein a 25% marketability discount was held to be appropriate, is misplaced for the additional reason that Blake involved a dissolution action resulting in the corporation buying-out the minority shareholders, not a dissenting shareholders' appraisal action. Blake, supra, 486 N.Y.S.2d at 344.
*565 Our recent opinion in Balsamides seems to be at variance with Blake. Thus, we do not find Wheaton's reliance on New York case law persuasive.
Although the business owned by Balsamides and Perle is hardly comparable to Wheaton in size, character or number of shareholders, and a fair value appraisal and a court-ordered buy-out in a dissolution context may require consideration of different factors, the basic principle and its rationale is equally applicable in this case. Defendants' shares were not being acquired by a third party. The shares were being acquired by the corporation and all shares are owned by family members with the exception of a relatively small portion of shares acquired by Bowater from Frank Wheaton, Jr. Restrictions on the sale of the stock and the lack of a ready market to dispose of the stock have no relevance to the corporation. Thus, as a general rule, we conclude, along with the great weight of recent authority, that no marketability discount should be utilized in a fair value determination in a fair value appraisal proceeding.
Judge Francis recognized that the applicability of a marketability discount is the "most consequential issue" in the case. He acknowledged that the courts throughout the country were divided on the issue. However, he did not decide whether a marketability discount should or should not be applied as a general rule. Rather, he seized on the "extraordinary circumstances" exception to the general rule against application of this discount announced by the American Law Institute. See 2 ALI, Principles of Corporate Governance § 7.22(a) (1992). He said:
Here, of course, the dissenters could have maintained both their private equity interests and their voting rights in Wheaton after the asset transfer and recapitalization. Nothing was taken from them except the ability to freely sell their shares in a very limited market if they chose to exchange them for the Class "A" stock with the supervoting rights. Be that as it may, it was the restructuring, not the recapitalization, that triggered the right to dissent. Moreover, the restructuring was a harmless action and done in order to prepare for a limited IPO to give the dissenters as well as some other shareholders the liquidity they sought. To allow it to bestow upon the dissenters a price significantly higher than any shareholder could have obtained in a market transaction under such circumstances would bring about an unfair wealth transfer from the remaining shareholders to them unless a discount for non-marketability was applied. Put bluntly, the dissenters exploited a change they themselves championed and possibly prevented an IPO to the detriment of other shareholders.
His reasons reflect comment e to § 7.22(a), which attempts to illustrate circumstances when a marketability discount is appropriate.
Judge Francis' reliance on the recently adopted Principles of Corporate Governance by the American Law Institute is well-founded. The courts of this State have frequently referenced the various scholarly efforts of the American Law Institute, particularly with respect to issues our courts have not addressed. See Brody v. Albert Lifson & Sons, Inc., 17 N.J. 383, 389-90, 111 A.2d 504 (1955) (Restatement of Torts); H. John Homan Co. v. Wilkes-Barre Iron & Wire Works, Inc., 233 N.J.Super. 91, 98, 558 A.2d 42 (App.Div.1989) (Restatement of Restitution and Restatement (Second) of Contracts); Citibank, N.A. v. Estate of Simpson, 290 N.J.Super. 519, 530, 676 A.2d 172 (App. Div.1996) (Restatement (Second) of Conflicts of Laws).
Section 7.22(a) recommends that a marketability discount should be applied only in "extraordinary circumstances." Comment e attempts to illustrate such a situation. It states:
Such circumstances require more than the absence of a trading market in the shares; rather, the court should apply this exception only when it finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to appraisal so as to divert value to itself that could not be made available proportionately to other shareholders. For example, assume that a financially strained corporation with highly illiquid assets amends its charter to eliminate preemptive rights and authorize *566 a new class of preferred stock in order to raise capital from a group of institutional investors, and that this charter amendment triggers appraisal. Because the corporation has highly illiquid assets and is financially troubled, fair value in an appraisal proceeding is likely to be significantly higher than the price that would actually be paid for a shareholder's stock in a market transaction. One shareholder dissents, solely because the shareholder had been unsuccessfully trying to induce the remaining shareholders to buy the shareholder out, and seeks to exploit the relatively minor certificate change as a mechanism to bail out of a troubled situation at a price that is much higher than any shareholder could obtain in a market transaction. On these facts, a court could find that the shareholder was opportunistically exploiting a change in the charter that was relatively minor, and to which the shareholder had no real objection. Here, unless a marketability discount was applied, there would be an unfair wealth transfer from the remaining shareholders to the dissenting shareholder.
Judge Francis' oral opinion demonstrates that he was persuaded that the circumstances in this case established such extraordinary circumstances.
Judge Francis' findings of fact are entitled to great deference. He, not this panel, had the opportunity to see and hear the various witnesses. His findings must be accepted unless those findings are not fairly supported by the record. Rova Farms Resort, Inc., supra.
In his oral opinion, Judge Francis' discussion of the circumstances surrounding the exercise of defendants' appraisal rights is somewhat conclusory. Nevertheless, our review of the record demonstrates that the trial judge's conclusion that defendants opportunistically exploited a minor corporate structural change to further their quest for liquidity without regard to the impact of their dissent on the company is supported by the record.
The evidence adduced at trial revealed that by 1990, four branches of the Wheaton family were involved in the daily operations of the corporation. In 1990, Frank Wheaton, Jr., resigned as President after a long tenure and under pressure. With his resignation, only three of the four branches of the family were involved in the operation of the company. It was at this time that Frank Wheaton, Jr.'s son, Frank Wheaton III, began to push for liquidity of the shares. Frank Wheaton III had surrendered his employment with the firm in 1984.
Frank Wheaton III testified that he was not the only one who wanted liquidity. Yet, only he and other members of his branch of the family rejected the Shareholder Liquidity Plan fashioned by the Board out of hand. He testified he believed a 150-day period for the Board to exercise its right of first refusal was unreasonable. Yet, at trial he conceded that the right of first refusal did not exceed sixty days.
To further the shareholders' desire for liquidity, the Board also began to examine a limited IPO. The corporate restructuring adopted by the Board on December 6, 1991, was in furtherance of the public offering. Frank Wheaton III's testimony, however, revealed that he never seriously considered the advantages or disadvantages of the restructuring. Rather, he saw the restructuring as a vehicle for immediate, rather than orderly, liquidity. The following testimony illustrates Judge Francis' ultimate conclusion concerning his actions:
MR. FINKELSTEIN (Q): What happened in the reorganization was that Wheaton provided you with the opportunity to dissent. In order to be more precise, Wheaton provided you with the opportunity for liquidity, correct?
FRANK WHEATON, III(A): Quite honestly, I always felt that the opportunity to dissent was put there, put forth for me to take it, because I was certainly a threat to Bob Veghte's lust for power, and this was a real good and easy way for him to get me out of the picture.
Q. But he couldn't have forced you out; you could have held fast and remained a shareholder whatever Bob Veghte

*567 A. No, but by giving the open door, he had already preplanned, in my mind, that I'd exit the door.
Q. But they gave you what you wanted in the reorganization, correct?
A. Apparently so.
Q. Well, it was more than apparently so in your deposition.
* * *
A. Yes. They gave me what I wanted.
* * *
Q. That's what you told me at the time of your deposition, correct?
A. Yes.
Q. I asked you in the deposition whether there was anything else about the reorganization, and you answered they gave you what you wanted.
Now, Mr. Sonnenfeld showed youdid you answer that part of the question Mr. Wheaton?
A. I think so.
Q. What was your answer?
A. Yes.
* * *
Q. ...I'm showing the holding company subsidiary structure. You didn't focus on that change in structure when you dissented, did you?
A. No.
Q. Your focus was on the opportunity to gain liquidity and you took that opportunity, correct?
A. Well, I had already formed my opinions, Mr. Finkelstein, as to where the company was going and what was going to happen, and so this wasn't surprising to me.
Q. But your focus was on the opportunity to gain liquidity, and you took that opportunity, correct?
A. As I told you, I had been seeking liquidity for some time, and I had shared that with Mr. Veghte.
Q. But you still haven't answered my question. Your focus was on the opportunity to gain liquidity in the reorganization, correct?
A. It was a right that was given to me, yes.
Q. And that was your focus?
A. Yes.
Another dissenter, James Strasenburgh, was unhappy concerning the resignation of Frank Wheaton, Jr., and lacked confidence in the new management. He advised Robert Veghte in February 1991 that he wished to sell his shares. He questioned Veghte about the right of first refusal in the liquidity plan. He also expected Veghte to "get back" to him about his desire to sell his shares. He, like many others, signaled his support for the IPO in June 1991. Yet, without any prior inquiry to management, he executed an option with Bowater in August 1991 to sell his shares. He testified that he dissented from the restructuring plan because he had not executed the liquidity plan and because he wanted to obtain fair value for his shares. He said,
It made no sense not to dissent. And really, in February, I'd gone to see Bob Veghte and I was interested in selling my shares. I was interested in fair value. I had asked him for a price. So here I'm going to get fair value, okay, let's go with fair value.
The record clearly supports the trial judge's ultimate conclusion that the dissenters seized upon a non-material corporate restructuring to trigger an appraisal remedy. The testimony of dissenters Frank Wheaton III and James Strasenburgh is significant because they controlled or greatly influenced the votes of associated family members. Moreover, we conclude that their actions and the motives for their actions comport with the extraordinary circumstances contemplated by the § 7.22(a) exception.

B. THE EMBEDDED MINORITY DISCOUNT.
Judge Francis noted that both experts acknowledged that there is usually an inherent or implicit minority discount in liquid or market value. With respect to this embedded or implicit minority discount, the trial court stated:

*568 Bear Ste[a]rns maintained that liquid or minority interest value contains an implicit minority discount. Wheaton conceded the point. The problem is how to quantify it. Mr. Lee proposed acquisition value less going concern value, but acquisition value invariably also includes a premium for control and potential synergies. Mr. Lee did not propose any other method, and my research does not disclose a generally accepted method. In default of a generally accepted method and a record to remove the imbedded minority discount, I am compelled to fix it at zero.
The embedded or inherent minority discount reflects the reduction in the overall liquid freely-traded value placed on share value because the traded shares are minority shares. This discount is distinguishable from a control premium, although they may be said to represent two sides of the same coin, with the control premium representing the added value of owning or purchasing ownership of a controlling block of shares. A control premium has been defined as the added amount an investor is willing to pay for the privilege of directly influencing the corporation's affairs. 18A AM. JUR.2d Corporations, § 795 (1985). As one commentator has explained: "A `control premium' is a second-stage adjustment made when the block of stock being valued carries control of the corporation. The control premium is stated as a fraction or percentage of the first-stage estimate of pro rata company value[.]" Thomas D. Hall, Comment, Valuing Closely Held Stock: Control Premiums and Minority Discounts, 31 Emory L.J. 139, 144 (Winter 1982). Delaware courts have upheld the application of a control premium at the corporate level, but not at the shareholder level. See Rapid-American, supra, 603 A.2d at 805-06.
In arguing for recognition of an eight to fifteen percent inherent minority discount, defendants Wheaton and Shaw primarily rely on an unpublished opinion of the Delaware Court of Chancery, Kleinwort Benson Ltd. v. Silgan Corp., 1995 WL 376911 (Del.Ch. June 15, 1995). We hesitate to rely on unpublished opinions, particularly because we do not rely on similar opinions of our court. See R. 1:36-3. Moreover, in In re Radiology Assocs., Inc., 611 A.2d 485, 494 (Del.Ch. 1991), the court rejected application of a 30% "implicit minority discount" as "inappropriate" to the facts in the case. The court rejected the minority shareholder's position that the discount should be applied because the discounted cash flow analysis utilized in the case included an implicit minority discount which, unless increased by corresponding adjustment, "fails to value fully the company as a whole with a premium over market price." Ibid. That the discounted cash flow method may have left out a premium that normally accrues when shareholders sell a company was not significant, according to the court, because "the appraisal process is not intended to reconstruct a pro forma sale...." Ibid., (quoting Cavalier, supra).
We must recognize that an expert's testimony must be based on evidence that has demonstrated market reliability or is otherwise generally accepted as reliable by experts or by courts. Bowen v. Bowen, 96 N.J. 36, 50, 473 A.2d 73 (1984). The acceptance or rejection of the opinion of expert witnesses as to the value of a corporation's stock is a matter peculiarly within the province of the trier of fact and its determination will be accorded great deference. Bricklin v. Stengol Corp., 1 Conn.App. 656, 476 A.2d 584, 589, certif. denied, 194 Conn. 803, 482 A.2d 709 (1984). See also Brundage v. The New Jersey Zinc Co., 48 N.J. 450, 478, 226 A.2d 585 (1967).
Our research suggests that the concept of an inherent, or embedded, minority discount is not a concept generally accepted in the financial community, Bowen, supra, 96 N.J. at 50, 473 A.2d 73; Dermody, supra, 191 N.J.Super. at 196, 465 A.2d 948; Weinberger, supra, 457 A.2d at 712-13. Judge Francis appeared to have reached this conclusion in granting Wheaton's motion to strike that portion of Lee's report dealing with the inherent minority discount without evidence of demonstrable market reliability or general acceptance of the concept. The trial judge's failure to adjust share value to reflect this discount was in no sense arbitrary.

*569 III
Judge Francis awarded 8.24% simple interest. His analysis focused on the most equitable rate of interest, rather than whether the interest should be compound or simple.
Defendants claim that the trial court abused its discretion by awarding simple rather than compound interest. They maintain that compound interest is necessary to put them in the same position they would have been had they received payment of fair value in January 1992. Defendants ask this court to reverse and direct an award of compound interest. The company asserts that the trial court did not abuse its discretion in awarding simple interest.
N.J.S.A. 14A:11-9(2) provides for the routine allowance of interest in an action to determine fair value unless the court finds the refusal to accept the offer of payment was arbitrary, vexatious or not in good faith. N.J. Sports & Exposition Auth. v. Del Tufo, 230 N.J.Super. 616, 623, 554 A.2d 878 (App. Div.1989), certif. denied, 121 N.J. 611, 583 A.2d 312 (1990).
We will affirm the interest award if the findings are supported by the record and are not arbitrary. Ibid.; see also Rapid-American Corp., supra, 603 A.2d at 808; McLoon Oil, supra, 565 A.2d at 1007. In McLoon Oil, the court reversed the lower court's failure to award annual compound interest in a dissenting shareholders' action because compounding "in this case is the only fair and equitable way to compensate the Dissenters for the lost use of their funds for nearly thirteen years." McLoon Oil, supra, 565 A.2d at 1007-08 (footnote omitted). However, the court further stated that its decision did not require compound interest to be awarded in all appraisal statute cases; rather, the court awarded compound interest "on the evidence" in the case and "in the absence of any proper basis for withholding compounding." Id. at 1008.
In Rapid-American, supra, the failure of the trial court to award compound interest was upheld as within that court's "broad power[ ]" of discretion under a statute specifically permitting a court to award simple or compound interest "as the Court may direct." Rapid-American, supra, 603 A.2d at 808-09. The Delaware Supreme Court has reached similar holdings in other statutory appraisal cases. See Cede & Co. v. Technicolor, Inc., 684 A.2d 289, 301 (Del.1996) (no abuse of discretion in awarding simple rather than compound interest); In re Shell Oil Co., 607 A.2d 1213, 1221-22 (Del.1992) (trial court did not abuse its discretion by accepting the recommendation of one expert over the other in awarding simple, rather than compound, interest in view of the trial court's opportunity to hear the expert testimony and evaluate the experts' credibility).
We affirm the award of simple interest. Here, the ultimate award of $41.05 per share is actually forty-five cents less than the initial offer of $41.50. Furthermore, an order was entered which enabled defendants to receive funds on a quarterly basis equivalent to the dividend paid to the remaining Wheaton shareholders, without prejudice to the ultimate outcome of the litigation.
We find no abuse of the broad discretion vested in the trial judge.
Affirmed.
NOTES
[1] Frank Wheaton III and Shaw claim in both their main brief and their reply brief that they were "oppressed" shareholders because they were denied their reasonable expectations of participation in the company by the majority shareholders. In its decision, the trial court found that there had been no oppression claim. At trial, Frank Wheaton III and Shaw conceded that "oppression" was not an element in the case, but they refused to concede that there had been no oppression on the part of the majority. Moreover, in addition to Frank Wheaton III and Shaw's concession at trial, this action was not brought under the "oppression statute," N.J.S.A. 14A:12-7(1)(c), and even Frank Wheaton III and Shaw concede that "oppression" is not a prerequisite to the exercise of appraisal rights nor "the appropriate remedy." Therefore, we do not consider this argument in the oppressed shareholder context.
[2] However, the Delaware block method continues to be utilized in many jurisdictions. See, e.g., Walter S. Cheesman, supra; Wyss, supra, 765 P.2d at 210; see generally Michael R. Schwenk, Note, Valuation Problems in the Appraisal Remedy, 16 Cardozo L.Rev. 649, 659-71 (Dec.1994).
[3] In their point IIA, defendants question the trial court's application of a minority discount. However, the trial court did not apply such a discount.